No. 83-102

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

DAN SIMMONS, as Guardian Ad Litem
of Breton Simmons, A Minor,

Plaintiff and Appellant,

-vs-

STATE OF MONTANA and STATE OF OREGON,

Defendants and Respondents.

---

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Douglas R. Austin, Missoula, Montana
Alan G. Starkoff argued; Starkoff & Starkoff Co.,
Cleveland, Ohio

For Respondents:

Garlington, Lohn & Robinson; Larry E. Riley, Missoula,
Montana
Pamela L. Abernathy argued, Asst. Atty. General, Salem,
Oregon
Boone, Karlberg & Haddon; Tom Boone, Missoula, Montana

---

Submitted: June 10, 1983

Decided: October 17, 1983

Filed: OCT 17 1983

*Ethel M. Harrison*

---

Clerk

Mr. Justice L.C. Gulbrandson delivered the Opinion of the Court.

Plaintiff, acting as guardian ad litem for his minor son, appeals from an order of the District Court of the Fourth Judicial District, Missoula County, granting defendant State of Oregon's motion to dismiss plaintiff's lawsuit on grounds that Oregon did not have sufficient minimum contacts with Montana so as to subject it to this state's jurisdiction, and also that, in any event, considerations of comity warranted dismissal. (The action by plaintiff against the State of Montana is still pending in the District Court). We affirm the District Court on both grounds.

The following pertinent facts are taken from the transcript of proceedings before the District Court, the pleadings, and relevant exhibits. Unless otherwise stated, these facts are not disputed or controverted by the respective parties.

Section 50-19-203, MCA, requires that a test designed to detect inborn metabolic disorders be performed on all children born in Montana. The attending physician or person responsible for birth registration must ensure that a blood sample is taken from each child so that a test can be done. The Montana Department of Health and Environmental Sciences is responsible for either conducting the tests itself or contracting with an approved laboratory to perform the tests. Since 1977, the department has contracted with the Health Division of the Oregon Department of Human Resources to perform the test in its laboratory in Portland. Oregon

also performs this service for Idaho, Nevada, and Alaska. Public health officials from all five states apparently decided that it was more cost effective to have the Oregon laboratory conduct the tests for the entire region. Montana, for example, has such a low yearly birth rate that it is cheaper to have the samples sent to the Oregon laboratory for analysis.

Under the terms of the interstate contract, first entered into in June, 1977, Oregon agreed to supply lab screening of all blood samples for metabolic disorders, according to standards set forth in M.A.C. section 16-2.18(6)-S1820 [now A.R.M. section 16.24.201-213]. Analysis was to take place in Oregon. The Montana Department of Health and Environmental Sciences was to be notified by mail or by telephone of any abnormal test results according to the urgency of laboratory findings. Normal test results were to be reported at weekly intervals by mail. Oregon maintained an in-house specialist in metabolic disorders, who would be available for consultation with the State of Montana or the Montana physician who took blood samples. The State of Montana agreed to collect the blood samples for forwarding to Oregon, and agreed to notify hospitals or physicians of significant findings. Montana agreed to pay Oregon $27,000 per year, in four quarterly installments, based on an average of 12,000 tests performed per year. Montana would pay an additional $2.25 for each sample in excess of 12,000. Oregon has argued, and the plaintiff has not disagreed, that the contract fees cover nothing more than the marginal cost of lab testing procedures. Montana does not contribute to the cost of

-3-

maintaining the laboratory or the establishing of the test procedures. Furthermore, Oregon does not profit from the contractual arrangement. The contract was signed in Montana and Oregon, and finally approved by Oregon budget authorities in 1977.

Breton Simmons was born in Missoula, Montana, on June 22, 1977. Shortly thereafter, a sample of his blood was taken and forwarded to Oregon not long after the interstate contract was signed. For some reason, however, the laboratory failed to detect the presence of a particular metabolic disorder, congenital athyrotic hypothyroidism, the symptoms of which became apparent a few months after Breton was born. Breton did not receive initial treatment for the illness until late September, 1977. As a consequence, the boy has allegedly suffered permanent and irreparable brain and neuromuscular damage.

Dan Simmons, as guardian ad litem for the boy, filed an action in Oregon District Court in August, 1979, alleging negligence on the part of Oregon authorities with respect to conduct of the lab test. Plaintiff's counsel in Oregon did not pursue the case, and it was subsequently dismissed for want of prosecution, although plaintiffs apparently have the option to refile in Oregon within the next few months. This appeal stems from a related suit filed in Montana, naming the State of Montana and the State of Oregon as defendants. Oregon filed a motion to dismiss the suit on grounds that it had not purposely availed itself of the privilege of conducting activities in Montana, and that the assertion of jurisdiction would be unreasonable and contrary to due process. In the alternative, Oregon argued that Montana

-4-

should decline jurisdiction as a matter of comity. Plaintiff countered that Oregon has sufficient minimum contacts with this State, and that comity did not preclude jurisdiction in this instance.

The trial court granted Oregon's motion to dismiss on both grounds. Plaintiff appealed from the trial court's order, asserting that the trial court erred by not finding that there were sufficient minimum contacts, and that comity did not preclude jurisdiction. This appeal was dismissed because it lacked proper certification under Rule 54(b), M.R.Civ.P. Subsequently, the appeal was properly certified, and plaintiff again asks us to reverse the trial court on the issues of minimum contacts and comity.

In a recent decision, the United States Supreme Court has emphasized that the reasonableness of asserting jurisdiction over a nonresident defendant must be assessed in the context of our federal system of government. See, World-Wide Volkswagen Corp. v. Woodson (1980), 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490. In other words, we are obliged to give serious consideration to the consequences acquiring jurisdiction will have on the maintenance of harmonious relations with other states.

For a Montana court to exercise jurisdiction over a nonresident defendant, two questions must be considered. (1) Does the nonresident defendant come within the provisions of Montana's long-arm jurisdiction statutes; and (2) would exercise of long-arm jurisdiction over the nonresident comport with traditional notions of fair play and substantial justice. May v. Figgins (Mont. 1980), 607 P.2d 1132, 37 St.Rep. 493; Haker v. Southwestern Ry. Co.

-5-

(1978), 176 Mont. 364, 578 P.2d 724. See, generally, International Shoe Co. v. Washington (1945), 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95. If we find, as a matter of statutory construction, that the nonresident does not engage in any of the several activities enumerated in our long-arm statute, then our analysis ends and we must decline jurisdiction. However, even if the nonresident has done something which potentially confers jurisdiction, we must advance to the due process component which is ultimately determinative of the jurisdictional question.

The relevant statute is Rule 4B(1), M.R.Civ.P., which provides, in pertinent part, that:

> "All persons found within the state of Montana are subject to the jurisdiction of the courts of this state. In addition, any person is subject to the jurisdiction of the courts of this state as to any claim for relief arising from the doing personally, through an employee, or through an agent, of any of the following acts:
>
> ". . .
>
> "(b) the commission of any act which results in accrual within this state of a tort action;
>
> ". . .
>
> "(e) entering into a contract for services to be rendered or for materials to be furnished in this state by such person;
>
> ". . .

Oregon cannot be said to be "found within" Montana, so our attention is turned to subsections (b) and (e). Neither plaintiff nor the State of Oregon has devoted much space to this aspect of the statutory question, as both appear to agree that either one or both subsections potentially confers jurisdiction over Oregon. Therefore, we turn our

-6-

attention to the crucial constitutional inquiry.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution limits the power of a state court to render a valid personal judgment against a nonresident defendant. Due process requires that a state may exercise personal jurisdiction over the nonresident only so long as there exist "minimum contacts" between the defendant and the forum state. See, International Shoe, supra, 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed. at 102. See also, Benham v. Woltermann(Mont. 1982), 653 P.2d 135, 39 St.Rep. 2017; Reed v. American Airlines, Inc. (Mont. 1982), 640 P.2d 912, 39 St.Rep. 335; May v. Figgins, supra. The concept of "minimum contacts" has undergone development since International Shoe, and the latest phase of that development must be examined here. In World-Wide Volkswagen Corp. v. Woodson, supra, the United States Supreme Court held that an Oklahoma court could not exercise personal jurisdiction over New York wholesale and retail auto dealers who transacted no business in that state and whose only "contact" with Oklahoma consisted of an automobile, purchased in New York by New York residents, that exploded in a collision in Oklahoma. The court rejected any attempt to connect the dealers to the Oklahoma forum on the basis that their product might foreseeably end up in that state and cause injury there. World-Wide Volkswagen, supra, 444 U.S. at 288-97, 100 S.Ct. at 562-7, 62 L.Ed.2d at 495-502. In its opinion, the court elaborated on the concept of minimum contacts, to wit:

> "The concept of minimum contacts . . . can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of

-7-

litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as co-equal sovereigns in a federal system."

444 U.S. at 291-2, 100 S.Ct. at 564, 62 L.Ed.2d at 498. (emphasis added) Thus, there is a "federalism component" which we are bound to consider in our constitutional inquiry. Before examining this component in some detail, we first look to the considerations relevant to protecting nonresident defendants from inconvenient litigation in the forum state. In World-Wide Volkswagen, supra, the Supreme Court enumerated these criteria:

"We have said that the defendant's contacts with the forum State must be such that maintenance of the suit 'does not offend "traditional notions of fair play and substantial justice."' International Shoe Co. v. Washington [326 U.S. 306 (310) 316], quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940). The relationship between the defendant and the forum state must be such that it is 'reasonable . . . to require the corporation to defend the particular suit which is brought there.' [citation omitted] Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum state's interest in adjudicating the dispute [citation omitted]; the plaintiff's interest in obtaining convenient and effective relief [citation omitted], at least when that interest is not adequately protected by the plaintiff's power to choose the forum [citation omitted]; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies [citation omitted]."

444 U.S. at 292, 100 S.Ct. at 564, 62 L.Ed.2d at 498.

The court observed that "limits imposed on state

jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years." World-Wide Volkswagen, supra, 444 U.S. at 292, 100 S.Ct. at 565, 62 L.Ed.2d at 498. This relaxation has been effected by improvement in transportation and communication, as well as advancements in the field of interstate commercial transactions. 444 U.S. at 292-3, 100 S.Ct. at 565, 62 L.Ed.2d at 498-9. But these historical changes have not rendered the "federalism component" less critical to the due process inquiry. On the contrary, the court emphasized that:

> ". . . we have never accepted the proposition that state lines are irrelevant for jurisdictional purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution. . . . [T]he Framers also intended that the States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their own courts. The sovereignty of each State, in turn, implied a limitation on the sovereignty of all of its sister States --- a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment."

444 U.S. at 293, 100 S.Ct. at 565, 62 L.Ed.2d at 499.

Furthermore, the Court indicated that the reasonableness of asserting jurisdiction over a nonresident defendant had to be assessed "in the context of our federal system of government . . ." 444 U.S. at 293-4, 100 S.Ct. at 565, 62 L.Ed.2d at 499, (citing International Shoe, supra, 326 U.S. at 317, 66 S.Ct. at 158, 90 L.Ed. at 102). That this observation is to be construed as a requirement that the "federalism component" be controlling in the due process

-9-

inquiry is supported by the Court's closing remarks on the relevant constitutional test of appropriate jurisdiction:

> "Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum state is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment."

444 U.S. at 294, 100 S.Ct. at 565-6, 62 L.Ed.2d at 499-500 (citing Hanson v. ~~Denkla~~ Denckla (1958), 357 U.S. 235, 251, 254, 78 S.Ct. 1228, 1238, 1240, 2 L.Ed.2d 1283, 1296,1298.

To summarize: our constitutional inquiry must recognize that the United States Supreme Court has "cut short any trend toward unlimited personal jurisdiction and emphasized that an isolated and unanticipated injury within the foreign state is not sufficient to support in personam jurisdiction." Taubler v. Giraud (9th Cir. 1981), 655 F.2d 991, 993. Because this Court has not had an opportunity to consider the effect of World-Wide Volkswagen on due process analysis, we look to opinions from federal and other state courts for persuasive guidance.

The Court of Appeals for the Ninth Circuit has developed a standard of review commensurate with traditional due process analysis and the concerns expressed in World-Wide Volkswagen:

> "If the nonresident defendant's activities within a state are 'substantial' or 'continuous and systematic,' there is a sufficient relationship between the defendant and the state to support jurisdiction even if the cause of action is unrelated to the defendant's forum activities. [citations omitted]

"If, however, the defendant's activities are not so pervasive as to subject him to general jurisdiction, the issue whether jurisdiction will lie turns on the nature and quality of the defendant's contacts in relation to the cause of action. In our circuit, we use the following approach in making this evaluation: (1) The nonresident defendant must do some act or consumate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking its laws. (2) The claim must be one which arises out of or results from the defendant's forum-related activities. (3) Exercise of jurisdiction must be reasonable. [citations omitted]."

Data Disc, Inc. v. Systems Tech. Assoc., Inc. (9th Cir. 1977), 557 F.2d 1280, 1287. See, also, Ins. Co. of North America v. Marina Salina Cruz (9th Cir. 1981), 649 F.2d 1266, 1270; Plant Food Co-op v. Wolfkill Feed & Fertilizer (9th Cir. 1980), 633 F.2d 155, 158-9; Panos Inv. Co. v. District Court (1983), ____ Colo. ____, 662 P.2d ~~181~~; 180 Schlatter v. Mo-Comm Futures, Ltd. (1983), ____ Kan. ____, 662 P.2d 553, 562; Markby v. St. Anthony Hosp. Systems (Wyo. 1982), 647 P.2d 1068, 1073. Inherent in this approach is the recognition that while a nonresident defendant may be found to have purposely availed itself of activities within a forum state, the exercise of jurisdiction may still be unreasonable.

The threshold question, then, is whether Oregon's activities in Montana are so pervasive as to subject it to the general personal jurisdiction of our courts. We cannot say that Oregon's contract with the Department of Health and Environmental Sciences amounts to "substantial" activity within this State. Nor can we say that this contract and the transactions related to it are "continuous and

-11-

systematic" in the sense this concept is usually applied. Cases cited by plaintiff for the proposition that Oregon has either substantial or continuous and systematic connections with Montana generally involve individual or commercial enterprises that actively solicit business within other states and derive substantial revenue from their activities. There is, in other words, a conscious effort to be involved in the economic life of a particular state. See, Southern Machine Co. v. Mohasco Industries, Inc. (6th Cir. 1968), 401 F.2d 374 (nonresident company actively transacting machinery parts business in Tennessee); Electric Regulator Corp. v. Sterling Extruder Corp. (D.Conn. 1968), 280 F.Supp. 550 (nonresident defendant contracts for machinery in Connecticut); Reed v. American Airlines, Inc., supra (nonresident airline company advertising and doing business in Montana, training instate travel agents, and deriving substantial revenue therefrom); State of North Dakota v. Newberger (Mont. 1980), 613 P.2d 1002, 37 St.Rep. 1119 (nonresident rock concert promoter actively promoting concerts & contracting for services in Montana). Oregon, on the other hand, has apparently been sought out by Montana and other states to perform a public health service for these states in Oregon and for a price not designed to generate a profit. This is not the same as deliberate, focused commercial activity.

Plaintiff's reliance on Wendt v. County of Osceola, Iowa (Minn. 1979), 289 N.W.2d 67, is misplaced. In Wendt, the Minnesota Supreme Court held that a political subdivision of Iowa was subject to the jurisdiction of Minnesota courts in a tort action arising from a road

accident along the Minnesota-Iowa border. Plaintiffs in that case were injured on a road one-half of which lay on the Iowa side of the border. Osceola County, Iowa, had a long-standing contract with a neighboring Minnesota county to maintain the entire road. The Minnesota high court held that the maintenance contract amounted to continuous and systematic contract with Minnesota, and that this factor, inter alia, made personal jurisdiction possible and reasonable. Nevertheless, Wendt is distinguishable from the facts at bar. Osceola County was obliged to perform services in the State of Minnesota on a continuing basis, whereas Oregon has contracted to conduct its activities within that state. In World-Wide Volkswagen, supra, the Supreme Court reasoned that nonresident defendants can usually foresee that their conduct or actions may ultimately have an impact in another state, but that the crucial factor with respect to due process analysis was that "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into Court there." 444 U.S. at 297, 100 S.Ct. at 567, 62 L.Ed.2d at 501. While it is reasonable for an Iowa county to ancitipate being called into a Minnesota court located scarcely a few miles away to defend itself in an action related to work done in Minnesota, we think it less reasonable for Oregon to assume that it should expect to defend a similar action in Montana on the basis of activities performed in Oregon. Even if Wendt can fairly be read to support plaintiff's contention, personal jurisdiction over Oregon in this case would still be unreasonable for reasons expressed later in this opinion.

Because Oregon's activities in Montana are not so pervasive, we turn to an analysis of that state's contacts under the three-prong test enunciated by the Ninth Circuit and deemed persuasive here. Because Oregon concedes that plaintiff's claim arises out of or results from Oregon's contract with the State of Montana, we need only consider the first and third prongs of the test.

Turning to the first prong, we consider whether Oregon has done something by which it has purposely availed itself of the privilege of conducting activities in Montana, thereby invoking the benefits and protections of our laws. See Data Disc. and related cases, supra. Case law from other jurisdictions involving commercial contracts and provision of medical services are most apropos for evaluating Oregon's activities under the first prong.

It is well-settled that a nonresident defendant's mere act of entering into a contract with a forum resident does not provide the necessary jurisdictional contact between the defendant and the forum state. See, e.g., Iowa Electric Light and Power Co. v. Atlas Corp. (8th Cir. 1979), 603 F.2d 1301; Lakeside Bridge and Steel v. Mountain State Construction (7th Cir. 1979), 597 F.2d 596; Barnstone v. Congregation Am Echad (5th Cir. 1978), 574 F.2d 286; Anderson v. Schiflett (10th Cir. 1971), 435 F.2d 1036. Most of these cases involved situations where nonresident defendants and forum state plaintiffs contracted for various goods and services, but where all or most of defendant's performance took place outside the forum state. The defendants did not maintain businesses, property, or agents in the forum state, and they did not actively transact

commercial or industrial activity therein. As such, their activities were structured around the prospect that they would not be litigating contract disputes in the courts of another state. The knowledge that the defendant's "product" was "destined" in some form for the forum was not a sufficient contact with that state so as to confer personal jurisdiction over the defendant, as the critical performance had taken place outside the forum. Iowa Electric, supra, 603 F.2d at 1306. Accord: Charia v. Cigarette Racing Team, Inc. (5th Cir. 1978), 583 F.2d 184, 189; Benjamin v. Western Boat Building Corp. (5th Cir. 1973), 472 F.2d 723, 730, cert. denied, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 64.

Similarly, Oregon has no property or agents in Montana, and transacts no business here. Oregon was sought out by the State of Montana to conduct lab testing for metabolic disorders, and this service is conducted in Oregon. Although it is aware that test results are destined for Montana, this is not enough contact to warrant a holding that it has purposely availed itself of the privilege of conducting activities in the forum state. Telephone and mail communication of test results do not transform the nature of the contact into a purposeful injection into Montana. Interstate communication is an almost inevitable accompaniment to doing business in the modern world, and cannot by itself be considered a "contact" for justifying the exercise of personal jurisdiction. See, e.g., Scullin Steel Company v. National Railway Utilization Corp. (8th Cir. 1982), 676 F.2d 309; Sporting Good Distributors, Inc. v. Whitney (N.D.Fla. 1980), 498 F.Supp. 1088. As the Eighth Circuit noted in Scullin Steel, supra, telephonic and mail

communication are generally "secondary or ancillary factors" to underlying transactions, and therefore do not provide the crucial minimum contacts. 676 F.2d at 314. In the immediate case, Oregon's mail and telephone communications merely confirm results reached in Oregon from tests performed there. (And, it is the Montana Department of Health and Environmental Sciences -- not the State of Oregon -- that has agreed to contact Montana physicians directly concerning test results.) These communications are within the realm of "secondary or ancillary factors."

An examination of cases involving the interstate provision of medical services also suggests that Oregon, in its role as a regional provider of lab testing for metabolic disorders, cannot be said to have purposely availed itself of the benefits and protections of the Montana forum. In Wright v. Yackley (9th Cir. 1972), 459 F.2d 287, the Ninth Circuit explored the ramifications of interstate medical services and their connections to a particular state. Mina Wright, while a resident of South Dakota, had been treated by Yackley, a South Dakota doctor, and at his urging had taken medication prescribed and obtained in South Dakota. Wright later moved to Idaho, and when her prescription expired, sought to have it filled in Idaho. The local druggist required confirmation of the prescription, so Wright wrote the South Dakota doctor for a copy of the old prescription, which he provided at no charge. Wright had the old prescription filled in Idaho, but later alleged that she had suffered injury as a consequence of using the drugs. She filed a malpractice action in Federal District Court in Idaho, asserting that the court had jurisdiction over the

South Dakota doctor by virtue of the prescription mailed to her. 459 F.2d at 288.

Both the District Court and the Ninth Circuit disagreed with plaintiff's assertion. The Ninth Circuit held that:

> "[i]f [the doctor] was guilty of malpractice, it was through acts of diagnosis and prescription performed in South Dakota. The mailing of the prescriptions to Idaho did not constitute new prescription. It was not diagnosis and treatment by mail. It was simply confirmation of the old diagnosis and prescription and was recognized by the druggist as such. It did, of course, put the doctor on notice that consequences of his South Dakota services would be felt in Idaho and that it was by his very act of mailing that this would be made possible. In our view, however, <u>this does no more than put the doctor in the position of one who, in South Dakota, treats an Idaho resident with knowledge of her imminent return to Idaho and that his treatment thus may cause effects there.</u>"

459 F.2d at 288-9. (emphasis added) Furthermore, the exercise of personal jurisdiction would be unreasonable:

> "In the case of personal services focus must be on the place where the services are rendered, since this is the place of the receiver's (here the patient's) need. The need is personal and the services rendered are in response to the dimensions of that personal need. They are directed to no place but to the needy person herself. It is in the very nature of such services that their consequences will be felt wherever the person may choose to go. However, the idea that tortious rendition of such services is a portable tort which can be deemed to have been committed whenever the consequences foreseeably were felt is wholly inconsistent with the public interest in having services of this sort generally available. Medical services in particular should not be proscribed by the doctor's concerns as to where the patient may carry the consequences of his treatment and in what distant lands he may be called upon to defend it. . . .

-17-

> The scope of medical treatment should be
> defined by the patient's needs, as
> diagnosed by the doctor, rather than by
> geography."

459 F.2d at 289-90.

The reasoning of the Ninth Circuit has been followed in similar circumstances in other jurisdictions. See, e.g., Lemke v. St. Margaret Hosp. (N.D. Ill. 1982), 552 F.Supp. 833 (alleged negligence in Indiana -- injury in Illinois); Kennedy v. Ziesmann (E.D.Ky. 1981), 526 F.Supp. 1328 (alleged negligence in Ohio -- injury in Kentucky); Jackson v. Wileman (W.D.Ky. 1979), 468 F.Supp. 822 (alleged negligence in Ohio -- injury in Kentucky); Glover v. Wagner (D.Neb. 1978), 462 F.Supp. 308 (alleged negligence in Iowa -- injury in Nebraska); Kurtz v. Draur (E.D.Pa. 1977), 434 F.Supp. 958 (alleged negligence in Nebraska -- injury in Pennsylvania). These courts have uniformly distinguished voluntary interstate economic activity, directed at the forum state's economic markets, from the provision of medical services outside of the forum state where the provider has not solicited clientele. Under these circumstances, the courts conclude that the aggrieved plaintiff "ought to expect that he [or she] will have to travel again if he [or she] thereafter complains that the services sought by him in the foreign jurisdiction were therein rendered improperly." Gelineau v. New York University Hosp. (D.N.J. 1974), 375 F.Supp. 661, 667.

We believe that the facts in Wright, supra, and later cases, closely resemble those of the immediate case. The residence of plaintiff here is not totally irrelevant as it was in the cited cases, because his child was entitled to the testing procedure as part of the Oregon-Montana

-18-

contract. As in the case of personalized medical services, however, the plaintiff, or more specifically, the blood sample, "traveled" to Oregon for tests conducted there. The results were then returned to Montana for the ultimate benefit of the child, while Oregon was compensated only for its marginal costs of operation. Oregon is certainly aware that the negative as well as positive consequences of its service will be felt in Montana, but, like the typical nonresident physician in the above-cited cases, it reasonably expects liability for the negative consequences only in its own state. In short, we think the facts of this case are more akin to the services discussed in Wright v. Yackley, supra, wherein the Ninth Circuit concluded that, because of the locus of performance and nature of the contract, the physician had not "purposely avail[ed] itself of the privilege of conducting activities within the forum State." 459 F.2d at 290, quoting Hanson v. ~~Denkla~~ (1958), Denckla 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298.

Plaintiff insists that the facts of the immediate case are virtually the same as those in McGee v. Riekhof (D.Mont. 1978), 442 F.Supp. 1276, and that the other medical services cases are therefore inapplicable. In McGee, the Federal District Court held a Utah physician subject to its jurisdiction on the basis of a telephone call made to his patient in Montana regarding a previously treated eye condition. But the plaintiff's only claim of negligence in that case was the new diagnosis given over the telephone; plaintiff was not resting any claim on the previous treatment in Utah. Thus, McGee is distinguishable from the

facts of the immediate case. Indeed, the court in McGee noted the relevant difference between cases involving negligent diagnosis and/or treatment in the defendant's state, and negligent diagnosis and/or treatment in the forum state:

> "In each of these cases [Aylstock v. Mayo Found. (D.Mont. 1972), 341 F.Supp. 560; McAndrew v. Burnett (M.D.Penn. 1974), 374 F.Supp. 460; Gelineau v. New York University Hosp. (D.N.J. 1974), 375 F.Supp. 661] the plaintiff had traveled out of the forum state to seek medical services elsewhere. While they were outside the forum, alleged negligent acts occured, and upon returning to the forum, they suffered injury. In each case the basis for the proximate cause of the injuries occured outside the forum. It is to these cases, that the 'portable tort' language of Wright [v. Yackley] is most apropos. The case at bar is singularly distinguishable because the alleged negligent act -- advising plaintiff to return to work prematurely -- occured in Montana. This is not a case of defendant treating plaintiff in Utah and then having the effects of the treatment felt only after plaintiff returned to Montana. Plaintiff McGee was in Montana when the diagnosis was rendered."

442 F.Supp. at 1278. The court observed that if the plaintiff had based his complaint upon the previous treatment in Utah, then the court would have declined jurisdiction. 442 F.Supp. at 1278.

Plaintiff in the immediate case is claiming negligence in the testing procedure and the diagnosis derived therefrom in Oregon, unlike McGee who could point to a new diagnosis which was rendered where it was received -- in Montana. In sum, we find McGee to be inapposite under the facts of the immediate case.

Thus, we cannot say that Oregon has purposely availed itself of the privilege of conducting activities in this

forum. Admittedly, a fair argument to the contrary can be made if one accepts an analogy between Oregon's contractual obligations and those of a private company interjecting itself into the Montana economy. Nevertheless, even if we accept this analogy for the purpose of argument, the assertion of jurisdiction would not pass muster under the "reasonableness" aspect of the three-pronged test. It is to the question of reasonableness that we now turn our attention.

As the United States Supreme Court observed in World-Wide Volkswagen, supra, the burdens imposed on nonresidents while defending lawsuits in a foreign State have diminished markedly through the years. 444 U.S. at 292-3, 100 S.Ct. at 565, 62 L.Ed.2d at 498. Oregon, without great difficulty, can adequately prepare for out-of-state suits and fairly defend its interests beyond its borders. But, this factor alone does not render it reasonable to subject the state to jurisdiction. Other criteria enumerated in World-Wide Volkswagen, supra, need to be considered here.

Montana courts certainly have an interest in allowing Montana plaintiffs to seek restitution for tortious conduct. See, World-Wide Volkswagen, supra, 444 U.S. at 292, 100 S.Ct. at 564, 62 L.Ed.2d at 498; cf. Kulko v. California Superior Court (1978), 436 U.S. 84, 98, 98 S.Ct. 1690, 1700, 56 L.Ed.2d 132, 145. (forum state has legitimate interest in protecting child welfare in interstate custody dispute.) However, it can almost always be said that a state has a legitimate interest in protecting legal rights. And this right may not be so compelling "as to outweigh the factors

militating against jurisdiction." Ins. Co. of North America v. Marina Salina Cruz (9th Cir. 1981), 649 F.2d 1266, 1273, citing Kulko, supra, 436 U.S. at 92, 98-101, 98 S.Ct. at 1696, 1700-1701, 56 L.Ed.2d at 141, 145-146. Likewise, the Montana forum may provide both convenient and effective relief for plaintiff, especially if a multiplicity of lawsuits can be avoided. But as the Supreme Court noted in World-Wide Volkswagen, supra, and the Ninth Circuit reiterated in Marina Salina Cruz, supra, 649 F.2d at 1273, this interest of plaintiff's might not be as significant if the plaintiff has the power to select a different forum. It is clear from the record that plaintiff had that choice and exercised it in favor of the Oregon forum in 1979. And, the option to refile in the near future is still open. Indeed, in its reply brief, plaintiff argues that "the imposition of personal jurisdiction would better serve the interests of justice" because in Montana, plaintiff could receive up to $300,000 under our state's tort claims law, as opposed to $100,000 under Oregon's tort liability statute. Or.Rev.Stat., Section 30.270 (1982). (We note here that in our recent decision in White v. State of Montana (Mont. 1983), 661 P.2d 1272, 40 St.Rep. 507, we held that the limitation on governmental liability for tort damages was unconstitutional, although the Montana legislature subsequently restored this limitation. See, S.B. 465, 48th Mont.Leg., Reg. Sess., Section 2(1), (to be codified at 1983 Mont. Laws 675)). We cannot say whether the evidence points to the justice of any particular award -- that is for a jury to decide. We can say, however, that predicating jurisdiction on which forum provides the highest possible

damage award would be conducive to the unacceptable practice of "forum-shopping."

From the standpoint of efficient resolution of this case, it is clear that Oregon may provide a better forum for adjudication. Plaintiff seems to focus his complaint almost solely on allegedly negligent acts committed within the State of Oregon. The lab tests and diagnosis were conducted there. Apparently, the most important witnesses for both parties will be located there. Since the case would most likely turn on testimony of these witnesses, a hearing in the nonresident's home state may be more advantageous. See, Marina Salina Cruz, supra, 649 F.2d at 1273.

The reasonableness of asserting jurisdiction over Oregon must also be assessed in light of the shared interest of both Montana and Oregon in advancing the state of quality medical testing technology. See, World-Wide Volkswagen supra, 444 U.S. at 292, 100 S.Ct. at 564, 62 L.Ed.2d at 498; Kulko, supra, 436 U.S. at 98, 98 S.Ct. at 1700, 56 L.Ed.2d at 145. The regional metabolic disorder testing program provided by Oregon is a by-product of the spirit of "co-operative federalism" as discussed by the U.S. Supreme Court. Because of our state's low birth-rate and the apparently high start-up costs of developing lab facilities and procedures, Montanans would normally not have the benefit of suitable testing procedures without access to Oregon's program. In expressing support for access to progressive out-of-state medical services, however, we do not belittle the significance of having those services performed according to the highest quality standards. See, e.g., McGee, supra, 442 F.Supp. at 1279. Justice undeniably

would be defeated if the refusal to assert jurisdiction would insulate Oregon from any malpractice claims. Nevertheless, we conclude that acquiring in personam jurisdiction over Oregon under the facts of this case would be unreasonable.

We emphasize that the services being attacked here were performed in Oregon, and that Oregon courts are open to vindicate the interests in quality medical care. Furthermore, courts have recognized that, in the situation where medical services have been performed outside the forum state, considerations of due process require more than an appreciation for quality medical care. In Wright, supra, the Ninth Circuit reasoned that:

> "the forum state's natural interest in the protection of its citizens is here countered by an interest in their access to medical services whenever needed. In our opinion, a state's dominant interest on behalf of its citizens in such a case as this is not that they should be free from injury by out-of-state doctors, but rather that they should be able to secure adequate medical services to meet their needs wherever they may go. This state interest necessarily rejects the proposition that the sufficiency of out-of-state treatment is subject to in-state inquiry."

459 F.2d at 291 (emphasis added). See also Kennedy, supra, 526 F.Supp. at 1331-2.

We find the reasoning of the Ninth Circuit persuasive, and conclude that the concern for keeping this interstate medical testing program available weighs against any interest in asserting jurisdiction over Oregon. To find otherwise under these facts might ultimately have a "chilling effect on the availability of professional services to nonresidents," Gelineau, supra, 375 F.Supp. at

-24-

667, to say nothing for the negative impact on the spirit of "co-operative federalism." If we found that jurisdiction was reasonable under the given facts, we would be creating precedent for jurisdiction over Oregon by other states that contracted with it for regional blood testing services. In that event, we think it highly likely that Oregon might refrain from providing the service rather than risk defending its interests in several foreign states. Thus, we find that proper respect for the mutual interests of interstate access to medical services and quality rendering of those same services requires that plaintiff pursue his malpractice claim in the Oregon courts.

The previous discussion leads us to consider the "federalism componet" given high credence by the United States Supreme Court in World-Wide Volkswagen. The focus of our discussion here is not that the defendant is a sovereign state, but rather, the right of Oregon courts to try actions pertaining to those entities "found within" it. World-Wide Volkswagen, supra, 444 U.S. at 293, 100 S.Ct. at 565, 62 L.Ed.2d at 499. In Marina Salina Cruz, supra, the Ninth Circuit, in construing World-Wide Volkswagen, observed that "it may be unreasonable to subject an out-of-state defendant to jurisdiction where the allegedly tortious act is committed outside of the forum state, having only an effect within the state, if the act is negligent rather than purposeful." 649 F.2d at 1271, quoting Data Disc., supra, 557 F.2d at 1288. By analogy, the court reasoned that the "reasonableness of jurisdiction . . . depends also in part upon the seriousness of the potential affront to the sovereignty of a defendant's state." 649 F.2d at 1272.

In the immediate case, the alleged negligent acts of the Oregon laboratory were apparently committed in that state and without intention of creating injury in Montana. It would, therefore, seem unwise to subject the State of Oregon to the jurisdiction of the courts of Montana. Plaintiff might still insist that the higher limitation on damage awards against the State of Montana would better serve the interests of justice. Under the particular facts of this case, however, a de-emphasis on sovereignty interests in order to insure the possibility of higher monetary damages would serve as an affront to the political decisions of Oregon, whose legislature has decided that a $100,000 limitation in suits against governmental agencies is appropriate.

In summary, Oregon has not structured its activities in such a way as to purposely avail itself of the privilege of functioning in Montana. More importantly, careful evaluation of the interests of sovereighty, efficiency of resolution, and provision of important interstate medical services, compel the conclusion that subjecting Oregon to jurisdiction under these facts would be unreasonable.

Even if we assume, for the purpose of argument, that the nature of Oregon's contacts with Montana are such that asserting jurisdiction would not offend due process, considerations of comity would compel dismissal of the suit. In Ehrlich-Bober & Co. v. University of Houston (1980), 49 N.Y.2d. 574, 404 N.E.2d 726, 427 N.Y.S.2d 604, the Court of Appeals of New York defined comity as:

> "'not a rule of law, but one of practice, convenience, and expediency' (Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 488, 20 S.Ct. 708, 710, 44 L.Ed 856). It

does not of its own force compel a particular course of action. Rather, it is an expression of one state's entirely voluntary decision to defer to the policy of another (Zeevi & Sons v. Grindlay's Bank [Uganda], 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168 cert. den. 423 U.S. 866, 96 S.Ct 126, 46 L.Ed2d 95). Such a decision may be perceived as promoting uniformity of decision, as encouraging harmony among participants in a system of co-operative federalism, or as merely an expression of hope for reciprocal advantages in some future case in which the interests of the forum are more critical."

49 N.Y.2d at 580, 404 N.E.2d at 730, 427 N.Y.S.2d at 608. Evaluation of these factors in the context of the immediate case lead us to the conclusion that plaintiff's lawsuit should be dismissed.

We agree with plaintiff that a state like Oregon is not constitutionally immune from suit in another state, see Nevada v. Hall (1979), 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed2d 416, and we recognize that some state courts have, in light of the Hall decision, rejected comity arguments and asserted personal jurisdiction over other states, see, e.g., Mianecki v. Second Judicial Dist. Ct. (1983), ____ Nev.____, 658 P.2d 422; Wendt v. County of Osceola, Iowa, supra. However, even plaintiff notes that the rule expressed in Hall does not require this court to assume jurisdiction over Oregon. Indeed, the Hall court reasoned that "[i]t may be wise policy, as a matter of harmonious interstate relations, for states to accord each other immunity or to respect any established limits on liability. They are free to do so." Hall, supra, 440 U.S. at 426, 99 S.Ct. at 1191, 59 L.Ed2d at 429. Thus, we are "free to close [our] courts to suits against a sister state as a matter of comity rather than constititional command." Struebin v. State (Iowa 1982), 322

-27-

N.W.2d 84, 87.

We find that our earlier observations with respect to due process apply with comparable force to the matter of comity. The instant case does not, so far as we can surmise, involve facts like those of Hall and related cases wherein non-resident defendants were clearly engaging in activities within the forum states. See Hall, supra, (Nevada employee involved in automobile collision with California residents on California highway); Mianecki, supra (Wisconsin parolee in Nevada involved in criminal conduct in Nevada); Wendt, supra (Iowa county involved in contract work in Minnesota). On the contrary, Oregon is performing a regional medical service within its boundaries. Furthermore, assumption of jurisdiction under these facts would impinge unnecessarily upon the harmonious interstate relations which are part and parcel of the spirit of co-operative federalism. Principles of comity, as well as due process, require that we not subject Oregon to the possibility of lawsuits in every state served by its medical testing facilities. To do otherwise could conceivably jeopardize the availability of this service. Contrary to plaintiff's assertions, our unwillingness to assume jurisdiction would not undermine the quality of this service. The Oregon forum is still open to vindicate any claim of negligence on the part of that state's medical laboratory. And, as we emphasized earlier in this opinion, the locus of the alleged negligent acts warrant consideration of the Oregon forum as the most convenient and efficient for resolution of this claim. Critical evidence and witnesses are located there, and therefore Oregon courts

have just as much, if not more, interest in adjudicating this dispute.

Once again, we note a special emphasis by plaintiff on the fact that Montana has a higher limit on tort liability for negligent acts by public agencies than that adopted by the Oregon legislature, and that plaintiff would therefore receive a more just compensation in Montana. We are reluctant to use this as justification for hauling Oregon before a Montana district court. We are in no position now to determine what constitutes a "just" award in this case, as there has been no trial on the merits of plaintiff's claim. Moreover, under the facts of this case, assertion of personal jurisdiction would unnecessarily project Montana law onto the alleged acts of another sovereign state. Comity urges us, at least in this instance, to give Oregon courts the opportunity to hear this case under the laws of that state.

In conclusion, we hold that assertion of jurisdiction over Oregon in this case would not comport with principles of due process. The matters considered in our constitutional inquiry also convince us that personal jurisdiction should not be allowed in the interests of comity. Accordingly, the judgment of the district court is affirmed.

_____
Justice

We concur:

_____

_____
John Conway Harrison
_____
Daniel J. Shea
_____
John C. Sherry
_____
Wesley Castles
_____
Justices


Mr. Justice Fred J. Weber specially concurs as follows:

I concur in the foregoing majority opinion only on the ground that we should decline jurisdiction as a matter of comity.

Justice

-30-