**Tom BERGHERR, as trustee for the next of kin of Joan Bergherr, Decedent, Respondent,**

v.

**Robert SOMMER, M.D., et al., Respondents,**

**Dallas Pathology Associates, Inc., d/b/a DPA Laboratory, Appellant,**

**MetPath, Inc., et al., Respondents.**

**No. CX-94-999.**

Court of Appeals of Minnesota.

Oct. 25, 1994.

Review Granted Dec. 20, 1994.

Terry L. Wade, Peter A. Schmit, Robins, Kaplan, Miller & Ciresi, St. Paul, for Tom Bergherr.

Anthony M. Tarvestad, Quinlivan, Sherwood, Spellacy, & Tarvestad, P.A., St. Cloud, for Robert Sommer, M.D., et al.

William M. Hart, Christopher J. Schulte, Meagher & Geer, Minneapolis, for Dallas Pathology Associates, Inc., d/b/a DPA Laboratory.

James R. Gowling, Geraghty, O'Loughlin & Kenney, St. Paul, for MetPath, Inc., et al.

Considered and decided by KLAPHAKE, P.J., and KALITOWSKI and THOREEN, JJ.

## OPINION

JOHN F. THOREEN, Judge.*

A foreign medical lab appeals a district court order denying its motion to dismiss for lack of personal jurisdiction. We agree with the district court that Minnesota may properly exercise jurisdiction over the foreign defendant where it has had numerous contacts with Minnesota through an intermediary.

## FACTS

Joan Bergherr (Bergherr) died at the age of 33 from cervical cancer. Her husband sued the attending doctor (Sommer) for failing to diagnose her illness. MetPath, Inc. (MetPath) and Dallas Pathology Associates, Inc. (DPA), medical labs that had examined cells taken from Bergherr's cervix, were later joined for allegedly failing to interpret properly her pap smear slides.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-

Over a 14-year period, Bergherr had a total of 10 pap smears taken by Sommer. For each smear, he would send slides with cells taken from her cervix to MetPath in Illinois for examination. MetPath is a nationwide reference laboratory which often "offloads" specimens to other labs for testing.

In 1988, MetPath and DPA, a Texas corporation, entered into an agreement by which MetPath would offload pap smear slides to DPA. DPA solicited this business from MetPath. DPA has no other contacts with Minnesota. It owns no property, conducts no business, and has no offices in Minnesota.

MetPath estimates that, in 1988, it shipped approximately 1,100 pap smears daily from Illinois and nearby states to DPA for analysis. Roughly 110 were from Minnesota. That number increased over the next few years. DPA charged MetPath $4.50 per slide until 1991, when it began charging $6.25. DPA received thousands of dollars every week from its analysis of pap smears from Minnesota. MetPath would send the specimens to DPA along with the MetPath requisition slip filled out by the requesting doctor. As the slip contained the patient's name and the address of the doctor, DPA knew which slides were from Minnesota.

DPA received and analyzed pap smears from Bergherr during the years 1989, 1990, and 1991. DPA's report to Sommer indicated that there had been some "atypical changes" and suggested various treatments. Plaintiff amended his complaint to include DPA after experts determined that these specimens were even more abnormal than DPA reported to Sommer. DPA moved for dismissal for lack of personal jurisdiction, and the district court denied its motion.

## ISSUE

Does DPA have sufficient minimum contacts with Minnesota to permit Minnesota courts constitutionally to exercise personal jurisdiction over it?

---

pointment pursuant to Minn. Const. art. VI, § 10.

## ANALYSIS

Determining whether personal jurisdiction exists is a question of law and this court need not defer to the trial court's decision. *Stanek v. A.P.I., Inc.,* 474 N.W.2d 829, 832 (Minn.App.1991), *pet. for rev. denied* (Minn. Oct. 31, 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992). Minn.Stat. § 543.19, subd. 1(d)(1–2) (1992) provides that a Minnesota court may exercise jurisdiction over a foreign corporation that

> (d) Commits any act outside Minnesota causing injury or property damage in Minnesota, subject to the following exceptions when no jurisdiction shall be found: (1) Minnesota has no substantial interest in providing a forum; or (2) the burden placed on the defendant by being brought under the state's jurisdiction would violate fairness and substantial justice.

Since this statute is to have the maximum territorial effect allowed under the due process clause of the federal constitution, the real inquiry in determining the permissibility of an exercise of jurisdiction is whether it meets constitutional muster. *Rostad v. On–Deck, Inc.,* 372 N.W.2d 717, 719 (Minn.1985), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985).

"Due process requires that a defendant have minimum contacts with a jurisdiction before being required to defend a lawsuit in that jurisdiction." *Id.* (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). The Minnesota Supreme Court has set forth the following five factors to consider in determining whether minimum contacts exist:

> (1) The quantity of contacts with the forum state;
> (2) The nature and quality of the contacts;
> (3) The source and connection of the cause of action with these contacts;
> (4) The interest of the state providing a forum; and
> (5) The convenience of the parties.

*National City Bank v. Ceresota Mill Ltd. Partnership,* 488 N.W.2d 248, 252–53 (Minn. 1992). The first three factors are the most important. *Id.*

### 1. *Quantity of Contacts*

It is undisputed that DPA has no direct contacts with Minnesota. The lack of direct contacts, however, does not necessarily preclude a state from exercising personal jurisdiction over a nonresident defendant. *Helten v. Arthur J. Evers Corp.,* 372 N.W.2d 380, 382 (Minn.App.1985), *pet. for rev. denied* (Minn. Oct. 24, 1985). Under the "stream-of-commerce" theory, a state can properly exercise jurisdiction over a defendant with no direct contacts if that defendant " 'delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state.' " *Rostad,* 372 N.W.2d at 720 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297–98, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)).

The trial court applied the stream-of-commerce theory to the present case, which involves the sale of services rather than the sale of goods, stating, "there are many similarities which are analogous as well as instructive." DPA argues that the stream-of-commerce theory cannot be applied in the present case and asserts that the only occasion to apply the theory is in product liability cases.

DPA cites several cases in which it claims Minnesota courts have consistently indicated that the stream-of-commerce theory is proper *only* in product liability cases. These cases state that Minnesota has adopted the theory in product liability cases. They do not *expressly* limit the application of the theory to that context. All of these cases involved a product of some kind, so it is not surprising that they referred to the stream-of-commerce theory as applying in the product liability context. *See Rostad,* 372 N.W.2d 717 (bat weights); *Helten,* 372 N.W.2d 380 (web splicer); *Stanek,* 474 N.W.2d 829 (asbestos); *Kohn v. La Manufacture Francaise des Pneumatiques Michelin,* 476 N.W.2d 184 (Minn.App.1991), *pet. for rev. denied* (Minn. Dec. 13, 1991) (tire).

Although Minnesota courts have never directly applied the stream-of-commerce theory to a case involving services, the analysis has been used to establish jurisdiction in

contexts other than product liability. *Doe 1–22 v. Roman Catholic Bishop,* 509 N.W.2d 598 (Minn.App.1993). In *Doe,* several children brought suit against James Porter, a priest who had sexually molested them in a Minnesota parish. The children brought suit in Minnesota and sought to join Fall River, Porter's diocese in Massachusetts, which had authorized his assignment to another parish after he underwent rehabilitation in Arizona. Fall River moved to dismiss for lack of personal jurisdiction and the trial court denied the motion. *Id.* at 600. Using a stream-of-commerce analogy, this court affirmed, finding that sufficient minimum contacts existed for the exercise of jurisdiction over Fall River. *Id.* at 601–02. This court reasoned that, like a manufacturer who places its product in the stream of commerce, Fall River could not shield itself from jurisdiction by the use of an intermediary and ignorance of the ultimate destination of the priest. *Id.* at 601 (citing *Rostad,* 372 N.W.2d at 721).

DPA asserts that the Minnesota Supreme Court expressly declined to extend jurisdiction to services under the stream-of-commerce theory in *Real Properties, Inc. v. Mission Ins. Co.,* 427 N.W.2d 665 (Minn.1988). In that case, plaintiff contracted with a Minnesota moving firm to package and move Chinese art pieces stored in New Jersey to Minnesota. The Minnesota firm contracted with Holman, a New Jersey corporation, to pack the goods. *Id.* at 666. Holman had contracted with the firm on five other occasions and also had 18 contacts unrelated to this transaction with Minnesota over a 15-year period as an agent of United Van Lines. *Id.* at 667. Many of the art pieces were broken in transit to Minnesota and plaintiff sued Holman and the Minnesota firm. *Id.* at 666. The Minnesota Supreme Court found jurisdiction over Holman inappropriate, concluding that Holman's conduct and connection with the state were not such that he should reasonably have anticipated being sued in Minnesota. *Id.* at 669.

The primary basis for the court's decision was Holman's minimal contacts with Minnesota. Holman had no direct contacts with Minnesota and his five or six indirect contacts through the Minnesota moving firm were "fortuitous and attenuated." *Id.* at 668. The court held that Holman's 18 contacts with Minnesota as an agent of United over a 15-year period were insufficient because they did not "demonstrate a continuous pattern of business sufficient to make it fair and reasonable to subject Holman to Minnesota's jurisdiction for a cause of action arising out of a transaction unrelated to these * * * contacts." *Id.* at 669.

DPA points to a footnote in which the court rejected the argument that Holman should be compared to a manufacturer under the stream-of-commerce theory. The court stated, "[t]here are * * * structural differences between a manufacturer of a product with a distribution system and, as here, the provider of a service who *sometimes* participates in a national carrier network." *Id.,* n. 3 (emphasis added). Although the court did refer to the difference between a manufacturer and a service provider, the court's focus remained on the frequency of the contacts. The court went on to point out in the footnote that Holman did not have the " 'plethora of indirect contacts' " that existed in *Rostad. Real Properties,* 427 N.W.2d at 669 (citation omitted). The stream-of-commerce theory was not rejected because services were involved, but because the number of indirect contacts was minimal.

DPA cites *Considine v. West Point Dairy Prods., Inc.,* 111 N.C.App. 427, 432 S.E.2d 412 (1993) and *Witchita Falls Gen. Hosp. v. Adolf,* 728 S.W.2d 604 (Mo.Ct.App.1987), *cert. denied,* 484 U.S. 927, 108 S.Ct. 292, 98 L.Ed.2d 252 (1987), as cases in which other courts have refused to apply the stream-of-commerce theory to a service when there were no direct contacts with the forum state. However, these cases, like *Real Properties,* involved a minimal number of contacts between the nonresident defendant and the forum state. *Considine,* 432 S.E.2d at 415 (Nebraska defendant's only contact with North Carolina was loading a truck which carried products to North Carolina); *Witchita Falls,* 728 S.W.2d at 609 (Texas hospital's only contact with Missouri was supplying organ to a patient). In contrast, DPA had numerous and continuous indirect contacts with Minnesota over a four-year period.

An examination of the reasoning underlying the stream-of-commerce theory further supports its application to the present case. In *Rostad,* 372 N.W.2d 717, the court used the stream-of-commerce theory in finding that the indirect contacts of a manufacturer with Minnesota through a distributor were sufficient minimum contacts to establish jurisdiction. *Id.* at 721. The defendant was a bat weight manufacturer who had no office, sales outlet, place of business, or agent in Minnesota. *Id.* at 720. However, thousands of weights were sold in Minnesota through distributors. The court found that these indirect contacts with Minnesota were sufficient to justify jurisdiction. *Id.* at 721.

The *Rostad* court adopted the United States Supreme Court's reasoning that it is not unreasonable to subject to suit a manufacturer or distributor who places its products into the stream of commerce, expecting that consumers in the forum state will purchase them. *Rostad,* 372 N.W.2d at 720 (citing *World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. at 567). "To hold otherwise," the court stated, "would be to 'doom all products liability cases to dismissal from forums other than the place of manufacture or initial sale.'" *Id.* (citation omitted). The court emphasized that

> due process does not extend so far as to permit a manufacturer to insulate itself from the reach of the forum state * * * by using an intermediary or by professing ignorance of the ultimate destination of a product.

*Id.* at 721 (citations omitted).

Applying the principles of the stream-of-commerce theory to the present case, DPA's numerous indirect contacts with Minnesota sufficiently satisfy the due process clause. Like the bat weight manufacturer, DPA has had no direct contacts with Minnesota, but has provided its service thousands of times to Minnesota residents through MetPath.

To hold that DPA is not subject to Minnesota jurisdiction because it had no direct contact would mean that DPA could only be sued in Texas and Illinois, a concept the *Rostad* court found unacceptable in the product liability context. *Id.* Like the manufacturer of a product, DPA similarly should not

be allowed to insulate itself from Minnesota's reach by its use of an intermediary—in this case MetPath. Therefore, we hold that DPA's systematic provision of numerous services to Minnesotans through MetPath establishes sufficient contacts to justify jurisdiction.

### 2. *Nature and Quality of Contacts*

◼ In reviewing the nature and quality of contacts, the focus is on whether the nonresident "purposefully availed" itself of the benefits and protections of Minnesota law. *Dent–Air, Inc. v. Beech Mountain Air Serv.,* 332 N.W.2d 904, 907 (Minn.1983). The "purposeful availment" requirement ensures that jurisdiction will not result from merely "random," "fortuitous," or "attenuated" contacts or from the "'unilateral activity of another party or third person.'" *Schuck v. Champs Food Sys., Ltd.,* 424 N.W.2d 567, 569–70 (Minn.App.1988) (quoting *Burger King v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985)). "The nonresident must be able to reasonably anticipate being haled into the state's court." *Id.* at 570 (citing *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567).

DPA argues that it did not purposefully avail itself of the benefits and protection of Minnesota law because it did not solicit business directly from Minnesota. DPA correctly points out that a nonresident defendant's solicitation of business in a forum state satisfies the purposeful availment requirement. *See Hanson v. John Blue Co.,* 389 N.W.2d 523, 527 (Minn.App.1986), *pet. for rev. denied* (Minn. Aug. 13, 1986). However, direct solicitation is not *required* to establish purposeful availment, as the *Rostad* case makes clear. *See, e.g., Rostad,* 372 N.W.2d at 721 (jurisdiction proper where solicitation was not done by nonresident defendant, but rather its distributor). Thus, like a distributor in a product liability case, MetPath's solicitation of business in Minnesota is sufficient.

The two cases cited by DPA are distinguishable and do not support its claim that it has not purposefully availed itself to Minnesota. In *Simmons v. Montana,* 206 Mont. 264, 670 P.2d 1372 (1983), an Oregon labora-

tory was sued in Montana for negligently performing tests on a Montana resident. Montana had sought out and contracted with Oregon to perform the tests. The tests were performed in Oregon and the prices charged by Oregon were not designed to generate a profit. *Id.* at 1379. The Montana Supreme Court concluded that Oregon had not purposefully availed itself of the privilege of conducting activities in Montana. *Id.* at 1382. Unlike Oregon, however, DPA solicited business from Minnesota through its agreement with MetPath and has benefitted economically from its "voluntary interstate economic activity." Moreover, the defendant in *Simmons* was a state providing a public health service to residents of its sister state, not a private corporation providing services to residents in another forum for profit.

Similarly, in *Grange Ins. Assoc. v. Washington,* 110 Wash.2d 752, 757 P.2d 933, 938–39 (1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989), the court refused to take jurisdiction over Idaho, which had failed to detect infected cattle under its detection program, because the economic benefits to Idaho were insignificant. In the present case, DPA enjoyed substantial economic benefits from its indirect contacts with Minnesota. These economic benefits and its solicitation of business from MetPath satisfy the purposeful availment requirement.

### 3. *Other Factors Supporting Jurisdiction*

■ The remaining factors to be considered in determining whether minimum contacts exist also support jurisdiction in the present case. *See National City Bank,* 488 N.W.2d at 252–53 (setting forth five factors). First, DPA's contacts with Minnesota through its agreement with MetPath gave rise to this litigation because it is DPA's alleged failure to interpret properly Bergherr's slides that is the basis of this suit. Second, Minnesota has an obvious interest in providing a forum to its resident in a wrongful death action. *See Kohn,* 476 N.W.2d at 187 ("Minnesota has a substantial interest in providing a forum for its citizens injured by acts of foreign corporations."). Finally, while it may be inconvenient for DPA to defend in Minnesota, this is the only forum where plaintiff can bring in all the parties and avoid piecemeal litigation. As with plaintiffs injured by products, refusing to extend jurisdiction over foreign service providers like DPA would force injured plaintiffs to bring suit in far off jurisdictions.

### DECISION

Minnesota may properly exercise jurisdiction over a foreign defendant who commits an act outside Minnesota which causes injury in Minnesota as long as it does not violate fairness and substantial justice. Minn.Stat. § 543.19, subd. 1(d)(2) (1992). If, as alleged, DPA misinterpreted the pap smears, thereby contributing to Bergherr's death, that was an act causing injury in Minnesota. Considering the volume of business and amount of revenue DPA received for the services it performed for Minnesota residents, it is not unfair or unjust to expect DPA to defend in Minnesota.

**Affirmed.**