DON FALCON *et al.*, d/b/a The El Leo Partnership, Plaintiffs-Appellees, v. ALLEN E. FAULKNER, d/b/a Faulkner Quarter Horses, Defendant (Ron Thomas, as Agent/Employee of Faulkner Quarter Horses, Defendant-Appellant).

Fourth District   No. 4—90—0466

Opinion filed February 21, 1991.

John F. Adams, of Quincy, for appellant.

Babette B. Rokusek, of Keefe, Gorman & Brennan, of Quincy, for appellees.

JUSTICE McCULLOUGH delivered the opinion of the court:

The Eleventh Judicial District Court for Flathead, Montana, entered a judgment in favor of plaintiffs, Don and Berta Falcon, d/b/a The El Leo Partnership (Falcon), and against defendant Ron Thomas (Thomas) in the amount of $131,010.80. Plaintiffs filed a petition for registration of foreign judgment, which the circuit court of Adams County granted. It is from that order defendant Ron Thomas appeals. Defendant contends (1) he did not have sufficient minimum contacts with the State of Montana for the Montana court to exercise personal jurisdiction over him; and (2) the plaintiffs committed fraud on the Montana court which gave it colorable jurisdiction. We affirm the circuit court.

Plaintiffs raised and bred horses in Columbia Falls, Montana, where they lived throughout these proceedings. Defendant Thomas resided in Quincy, Illinois, at all times relevant to this appeal. Thomas bought and sold horses as well as breeding-rights contracts to specific horses. Defendant Allen E. Faulkner, d/b/a Faulkner Quarter Horses (Faulkner), is located in Edmond, Oklahoma. Faulkner was in the business of breeding horses and was the owner of the stallion named "Impressive."

Sometime in 1985, Thomas purchased from Faulkner approximately six breeding-rights contracts for "Impressive," a well-known stallion in the horse-breeding industry. Thomas either paid cash for these contracts ($10,000 each) or traded a mare in lieu of a cash payment. Thomas then either attempted to breed one of his own mares

pursuant to one of the contracts or sold the contract to another horse owner for breeding to "Impressive." It is through the latter alternative that this dispute arises.

The exact sequence of events which form this dispute is contradicted by the parties. Thomas contends he first met Falcon at a horse show in Denver, Colorado, in January 1986. It is here, according to Thomas, he first advised Falcon of the fact that he had for sale a breeding-rights contract for "Impressive." Thomas advised Falcon he bought the contract for $10,000 but would sell it to Falcon for $7,500. Falcon told Thomas he was interested in breeding his mare "First El Leo" to "Impressive" but had to speak with his partners before making a firm commitment. Thomas alleges Falcon told him to telephone him in Montana at a later date to further discuss this sale. Thomas did later call Falcon in Montana at which time Falcon told Thomas he had not had a chance to speak with his partners. Falcon told Thomas he would return the call to Thomas in Quincy after speaking to his partners. During this phone call, Thomas told Falcon the sale price was $7,500. Thomas alleges Falcon called him back in Quincy and offered $2,500. They negotiated the price and finally agreed upon a price of $5,000. Thomas sent Falcon a copy of his breeding contract and in return Falcon sent a check for $2,500 and a letter. The letter stated the check was for partial payment on the contract and "if [Thomas] don't mind" a check for the other $2,500 would follow when Falcon's mare was in foal.

Falcon contends the first time he was aware this breeding-rights contract existed was when Thomas made an unsolicited phone call to him in Montana advising him of the contract. Falcon contends Thomas quoted the price of the contract at $7,500 in this first conversation. According to Falcon, Thomas called at least six times in a two-week period after the initial phone call to discuss this offer. Finally they agreed upon a price of $5,000, with Falcon paying $2,500 down and the balance when the mare was in foal. Falcon contends it was in a phone call from Thomas to Falcon in Montana that this final price and terms were agreed upon. Falcon wanted to see the contract before sending any money, so Thomas mailed the contract to Falcon. Falcon read the contract and noticed a provision that required the consent of Faulkner before the contract could be transferred. Falcon called Faulkner on March 26, 1989, and spoke to Faulkner, who consented to the transfer from Thomas to Falcon. Falcon noted this on the contract and then filled in the name, registration number and age of "First El Leo" as well as the name and address of the El Leo Partnership as the owner of the contract.

Subsequently, Falcon delivered the mare to Faulkner for breeding with "Impressive." After approximately 2½ months, the mare was delivered back to Falcon on the belief that she was pregnant. Unfortunately, she was not. One year later, Falcon again delivered the mare to Faulkner for breeding with "Impressive." However, Faulkner refused to breed the horses, stating Thomas had told him not to.

Falcon contends Thomas told Faulkner not to breed the horses until Thomas received an additional $5,000; $2,500 being the balance due under the original contract and another $2,500 which represented the cost of boarding the mare a second time. Thomas alleges Falcon gave up the right to the second breeding because of a letter Falcon wrote to Thomas in July 1986 after the first breeding. This letter stated Falcon's mare was veterinarian checked and was not in foal. Thus, Falcon wrote, "If you are agreeable, I'd like my $2,500 back and you can have the breeding to do as you wish." Although Thomas never returned the money, he contends Falcon gave up the second breeding and, thus, he was justified in refusing to allow the second breeding.

It is on the basis of this refusal of the second breeding that Falcon filed suit in Montana against Thomas and Faulkner. The complaint alleged breach of contract and fraud. Thomas failed to appear or answer the complaint and, thus, a default judgment was entered against him. The Montana trial court found (1) Thomas first informed Falcon of this breeding right contract through an unsolicited telephone call from Thomas to Falcon in Montana; (2) this offer was accepted by Falcon in Montana and this amounted to the transaction of business in Montana, which in turn gave the Montana court personal jurisdiction over Thomas; (3) Thomas instructed Faulkner not to allow the second breeding and this refusal deprived Falcon's mare from having a foal; and (4) Thomas knowingly made false representations to Falcon and these false representations were material and substantial to the agreement. Thus, according to the Montana court, Thomas' actions were malicious and in bad faith and, therefore, were outside the scope of Thomas' employment and/or agency with Faulkner. Finally, the Montana court fixed the amount of judgment at $131,010.80, which included the value of the foal (had it been conceived), breeding costs, punitive damages at $25,000, attorney fees, and court costs.

It is this judgment Falcon sought to register in Adams County, Illinois. Thomas filed a motion to strike the petition for registration of foreign judgment, and both parties submitted briefs in support of their respective positions. The circuit court also heard testimony from

Falcon and Thomas at an evidentiary hearing. Thomas alleged the judgment could not be registered because the Montana court lacked personal jurisdiction and further alleged Falcon committed fraud on the Montana court in procuring the judgment. Falcon argued Thomas had sufficient contacts with Montana to enable the court to obtain jurisdiction and no fraud was committed upon the court. It should be noted the record is unclear as to what happened with respect to defendant Faulkner in the Montana proceedings. The Montana judgment made no mention of Faulkner, and he was not a party to the matter in the Illinois courts.

After considering the briefs and hearing testimony, the circuit court granted the petition for registration of foreign judgment. The circuit court found Thomas was not the agent of Faulkner and, therefore, did not commit any acts that were in bad faith or outside the scope of his agency. The circuit court found Thomas first made the offer to assign the breeding contract to Falcon through a telephone call to Falcon in Montana and that Falcon in return made phone calls to Thomas in Illinois. The circuit court further found it was impossible to determine the exact point at which the contract was formed. In addition, the circuit court found Thomas sent Falcon a contract with some language missing and Falcon subsequently filled in the missing language after speaking with Faulkner and obtaining consent to transfer the contract. The circuit court found the contract between Faulkner and Thomas was assigned to Falcon in Montana when Falcon filled in the missing language. Finally, the circuit court found Thomas instructed Faulkner not to allow the second breeding until Falcon paid the balance due Thomas for the assignment of the breeding contract.

Based on these findings, the circuit court concluded the Montana court had jurisdiction over Thomas. Contacts that justified the Montana jurisdiction, as determined by the circuit court, were as follows:

(1) Falcon resided in Montana (deemed not a significant contact);

(2) Thomas initiated the transaction by a call to Montana (deemed not a particularly significant contact in this case);

(3) Thomas sent the contract papers to Montana expecting that Falcon would fill them out there (deemed a more significant contact); and

(4) the assignment of the Faulkner-Thomas contract to Falcon was technically performed in Montana when Falcon filled in the blanks on the contract.

■■ ■ Thomas' first argument is that he did not have sufficient "minimum contacts" with the State of Montana to allow the Montana

court to acquire personal jurisdiction. When a party seeks to register the judgment of a foreign State, Illinois courts may question the jurisdiction of the rendering State. This inquiry depends upon whether the defendant was subject to jurisdiction under the rendering State's law as limited by due process requirements. *Texas Axles, Inc. v. Baillie* (1986), 140 Ill. App. 3d 760, 489 N.E.2d 16.

The Montana long-arm statute provides:

> "(1) *** All persons found within the state of Montana are subject to the jurisdiction of the courts of this state. In addition, any person is subject to the jurisdiction of the courts of this state as to any claim for relief arising from the doing personally, through an employee, or through an agent, of any of the following acts:
>
> (a) the transaction of any business within this state." (Mont. Code Ann., tit. 25, ch. 20, Rule 4B(1)(a) (1989).)

The Montana Supreme Court interpreted this provision of the long-arm statute in *Prentice Lumber Co. v. Spahn* (1970), 156 Mont. 68, 474 P.2d 141. In that case, a resident of Montana sued a Wisconsin resident for money due under a lumber contract. The plaintiff was a Montana corporation engaged in the business of selling lumber wholesale, and the defendant was an individual doing business in retail lumber and construction. The defendant only made one direct order for lumber to the plaintiff. The other lumber orders were made to plaintiff by a third party. The lumber was shipped directly to defendant in Wisconsin on the order of the third party. The defendant paid the plaintiff directly by check until the third party advised otherwise. In total, there were 16 transactions between the plaintiff and defendant. They had never met, and the defendant had never been in Montana.

The trial court there had dismissed the complaint, finding the Montana court lacked jurisdiction over the Wisconsin defendant. The supreme court reversed, holding there was jurisdiction over the nonresident defendant. The court stated there were sufficient "minimum contacts" with the State of Montana to satisfy the long-arm statute and due process requirements. The court stated:

> "[T]he facts of the instant case square with the federal test and recognizing a prevailing trend toward expanding the permissible scope of state jurisdiction over the person or nonresident defendants *** Rule 4B(1)(a) [of the Montana Rules of Civil Procedure], encompasses the facts of this case and confers Montana's jurisdiction over [defendant]." *Prentice*, 156 Mont. at 76, 474 P.2d at 145.

■ The trial court here found Thomas initiated the transaction by a telephone call to Montana and sent the papers to Montana expecting that Falcon would complete them in Montana. The court further found the assignment was technically performed in Montana when Falcon filled in the missing language. Given the interpretation of the long-arm statute by the Montana Supreme Court, we believe that Thomas "transacted business" in the State of Montana sufficient to comply with the long-arm statute. The activities of Thomas within the State of Montana are at least as compelling as those of defendant in *Prentice*. The first part of this inquiry as to whether there was jurisdiction under Montana law is satisfied.

However, the jurisdictional inquiry does not end there. The assertion of personal jurisdiction over a nonresident defendant must also satisfy due process requirements.

The seminal case in jurisdictional issues is *International Shoe Co. v. State of Washington* (1945), 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154. The Supreme Court held due process is satisfied if a nonresident defendant has "minimum contacts" with a foreign State such that the maintenance of the suit does not offend the traditional notions of fair play and substantial justice. The court expanded this holding to its farthest reaches in *McGee v. International Life Insurance Co.* (1957), 355 U.S. 220, 2 L. Ed. 2d 223, 78 S. Ct. 199. There, the Court upheld jurisdiction over a nonresident defendant when the only contact between the defendant and the forum was the mailing of a re-insurance certificate by the defendant to a decedent in California. The Court held that for due process purposes, it was sufficient that the insurance contract was the basis of the suit and it had substantial contact with the forum.

However, one year later, in *Hanson v. Denckla* (1958), 357 U.S. 235, 2 L. Ed. 2d 1283, 78 S. Ct. 1228, the Court curtailed the sweeping effect of *McGee*. The Court stated that there must be some act by which the defendant purposefully avails himself of the privilege of conducting business in the forum and, thus, invokes the benefits and protections of the laws of the forum in order to satisfy due process.

■ The constitutional limits of *International Shoe* and its progeny can be satisfied in one of two ways. First, if the defendant's contacts with the forum are "substantial" or "continuous and systematic," general jurisdiction may be proper even if the cause of action is unrelated to defendant's contacts with the forum. If the defendant's contacts are not continuous and systematic, jurisdiction may still be proper as limited jurisdiction if there is a strong relationship between the cause of action and the defendant's contacts with the forum.

*Decker Coal Co. v. Commonwealth Edison Co.* (9th Cir. 1986), 805 F.2d 834.

In *Simmons v. Montana* (1983), 206 Mont. 264, 670 P.2d 1372, the Montana Supreme Court adopted a three-part test developed by the Ninth Circuit Court of Appeals which comports with *International Shoe* and the cases that follow it for due process analysis. The test is used when jurisdiction depends on the relationship between the defendant's contacts with the forum and the cause of action. The test is as follows:

> " '(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking its laws. (2) The claim must be one which arises out of or results from the defendant's forum-related activities. (3) Exercise of jurisdiction must be reasonable.' " (*Simmons*, 206 Mont. at 276, 670 P.2d at 1378, quoting *Data Disc, Inc. v. Systems Technology Associates, Inc.* (9th Cir. 1977), 557 F.2d 1280, 1287.)

Since Thomas' activities are not "substantial" or "continuous and systematic," this test must be utilized to determine if due process was satisfied. The first inquiry is whether Thomas purposefully availed himself of the privilege of doing business in Montana. Purposeful availment centers on whether a defendant's contacts are attributable to his own actions or solely those of the plaintiff. (*Decker*, 805 F.2d at 840.) It requires some affirmative act by the defendant which allows or promotes the transaction of business with the forum. (*Decker*, 805 F.2d at 840.) If a defendant directly solicits business in the forum State, the resulting transaction probably constitutes the deliberate transaction of business within the forum, thereby invoking the privilege of conducting business in the forum. (*Decker*, 805 F.2d at 840.) It has also been stated that contract negotiations in the forum are probably sufficient contacts to invoke the privilege of transacting the business in the forum. *Decker*, 805 F.2d at 840.

The Montana Supreme Court has stated that a nonresident defendant's act of entering into a contract with a resident of the forum is not a sufficient contact by itself for jurisdiction. (*Simmons*, 206 Mont. at 279, 670 P.2d at 1380.) Likewise, interstate communication alone is not a sufficient contact for exercising personal jurisdiction. *Simmons*, 206 Mont. at 279, 670 P.2d at 1380.

Thomas purposefully availed himself of the privilege of transacting business in Montana. He telephoned Falcon in Montana with an offer to sell the breeding contract. Thomas and Falcon negotiated the

terms of the contract through various telephone calls between Montana and Illinois. Thomas sent the contract to Falcon in Montana with the expectation that Falcon would fill in the missing language, which he subsequently did. It was Thomas' own actions, through the unsolicited telephone call to Falcon in Montana, that caused the assignment of the contract to occur. Falcon did not initiate the transaction. Thomas, by the telephone call, allowed and promoted the transaction of business in Montana. Thomas directly solicited business in the State of Montana and, thus, purposefully availed himself of the privilege of conducting business in the State of Montana.

■ The second part of the test requires the cause of action to arise out of or relate to the defendant's forum-related activities. The cause of action here was for breach of contract and fraud. There are two contracts involved in this matter: the first being an assignment from Thomas to Falcon of the breeding-rights contract and the second being the actual breeding contract between Falcon and Faulkner. The breach occurred in the Falcon-Faulkner contract when Faulkner refused the second breeding. However, there could not have been a breach of the Falcon-Faulkner contract if the Falcon-Thomas assignment never occurred and if Thomas had not told Faulkner to refuse the second breeding. Therefore, the cause of action arose out of or is related to Thomas' contacts with Montana.

■ Finally, the third prong of the test requires that the exercise of jurisdiction must be reasonable. There are seven factors which are relevant to this inquiry. These factors are:

"(1) The extent of purposeful interjection into the forum state;

(2) The burden on the defendant of defending in the forum;

(3) The extent of conflict with the sovereignty of defendant state;

(4) The forum state's interest in adjudicating the dispute;

(5) The most efficient judicial resolution of the controversy;

(6) The importance of the forum to plaintiff's interest in convenient and effective relief;

(7) The existence of an alternative forum." (*Decker*, 805 F.2d at 840.)

These factors determine whether, under the totality of the circumstances, a defendant could reasonably anticipate being called to defend in a lawsuit in the forum State. The relevance of each factor is to be considered and balanced accordingly. *Decker*, 805 F.2d at 840.

■ Applying these seven factors to the facts of this case, we find as follows. First, Thomas purposefully interjected himself into

Montana in two ways: (a) with the unsolicited phone call to Falcon and (b) by mailing the contract to Falcon. It was Thomas' actions alone that initiated this transaction. Second, the burden on Thomas to defend in Montana was not unreasonable due to the advances made in interstate transportation and communications. Thomas could very easily call an attorney in Montana to defend him in the case or drive himself to Montana to appear and defend. Third, conflicts with State sovereignty interests are minimal due to the Supreme Court's indication that the personal jurisdiction requirement is a function of the individual liberty interest protected by the due process clause rather than federalism concerns. (*Decker*, 805 F.2d at 841.) Fourth, Montana clearly has an interest in protecting its citizens from improper conduct of others in the transaction of business. If a Montana resident is a party to a contract, Montana courts clearly have an interest in seeing that its citizens receive all the benefits expected under the contract. The best way to insure this is to allow the Montana court to resolve the contractual disputes. Fifth, efficient judicial resolution can be had in either Montana or Illinois since the only parties to the dispute reside in those States. Sixth, Montana is the most convenient forum for Falcon since he resides there. However, Illinois would be better for effective relief. If Illinois were the forum, there would be no need for Falcon to register the judgment in order to execute it. Seventh, there are alternative forums in Illinois or Oklahoma. Oklahoma could be a possible forum because the actual breach of the underlying contract occurred there, and Illinois could be the forum if a court were to conclude that the assignment contract was formed in Illinois. Considering all of these factors, based on the totality of the circumstances, it was not unreasonable for a Montana court to exercise jurisdiction over Thomas.

■■■ Therefore, defendant has sufficient minimum contacts with the State of Montana to allow the Montana court to exercise personal jurisdiction over him. The trial court's decision that personal jurisdiction existed was not against the manifest weight of the evidence.

The second issue raised by Thomas is that Falcon committed fraud upon the Montana court which allowed it to obtain colorable jurisdiction. Thomas contends Falcon's characterization of him as "agent/employee of Faulkner" in the caption of this case is fraudulent. Thomas alleges further fraud occurred because the copy of the contract attached to the complaint is not the same contract offered as evidence by Falcon at the evidentiary hearing in Illinois.

■■■ Both Illinois and Montana have adopted the Uniform Enforcement of Foreign Judgments Act (Act) (Ill. Rev. Stat. 1983, ch.

110, par. 12—601 *et seq.*; Mont. Code Ann. §§25—9—501 through 25—9—508 (1989)). Therefore, we may look to Illinois law to determine if fraud occurred on the Montana court which would prevent the registration of the foreign judgment in Illinois. Section 12—602 of the Act (Ill. Rev. Stat. 1983, ch. 110, par. 12—602) provides for the registration of foreign judgments in this State. Section 12—608 of the Act (Ill. Rev. Stat. 1983, ch. 110, par. 12—608) sets forth the defenses available to prevent registration of the foreign judgment. A judgment debtor may defend against a foreign judgment sought to be registered in Illinois but not on grounds that could have been presented to the foreign court when the judgment was rendered. *Thompson v. Safeway Enterprises, Inc.* (1978), 67 Ill. App. 3d 914, 385 N.E.2d 702.

Illinois courts will not rehear the merits of the case because of the principles of *res judicata.* Under these principles, the nature and the amount of the judgment, together with all defenses that could have been raised in the original trial court, are foreclosed. (*Dawson v. Duncan* (1986), 144 Ill. App. 3d 532, 494 N.E.2d 900.) However, a collateral attack may be had on a foreign judgment in two instances. The defense of fraud in the procurement of the judgment (extrinsic fraud) or the defense of lack of jurisdiction in the foreign court may be raised. *Dawson*, 144 Ill. App. 3d at 537, 494 N.E.2d at 903.

Illinois courts have distinguished between two types of fraud. There is fraud which prevents the forum court from acquiring jurisdiction, or merely gives it colorable jurisdiction (extrinsic fraud); and fraud which occurred after the forum court acquired jurisdiction, such as false testimony or concealment (intrinsic fraud). It is only extrinsic fraud that renders a judgment void. (*Dawson*, 144 Ill. App. 3d at 540, 494 N.E.2d at 905.) The classic definition of "extrinsic fraud" refers to situations where "the unsuccessful party has been prevented from exhibiting fully his case *** as by keeping him away from court *** or where the defendant never had knowledge of the suit." *United States v. Throckmorton* (1878), 98 U.S. 61, 65-66, 25 L. Ed. 93, 95.

In *Dawson*, the defendant argued that there was fraud in the procurement of a judgment against him. The plaintiffs had filed a suit on a note that was in default on which the defendant's signature appeared. The defendant argued he had never signed the note, he had never authorized his signature to be signed and, therefore, the note was a forgery. The defendant's signature was on the note but it had been signed by his attorney. This court held this type of alleged fraud fell into the intrinsic fraud category. This court stated the defendant could have defended on the basis of that fraud in the foreign court but he chose not to do so. Thus, since this was not the type of fraud

that prevented the foreign court from acquiring jurisdiction or merely gave it colorable jurisdiction, it was not a defense to the registration of the judgment.

■■■ The first fraud alleged by Thomas is the mischaracterization of himself as the agent of Faulkner in the caption of the case. The Montana court found Thomas was the agent of Faulkner and that Thomas made false representations to Falcon which were outside the scope of his agency. It was on the basis of these false representations, outside of the scope of the agency, that the Montana court determined punitive damages were awardable to Falcon. Although the Montana court did find Thomas was the agent of Faulkner, that court did not use this agency status in determining if there was jurisdiction over Thomas. The determination of the agency status only goes to the amount of the judgment rendered against Thomas and not to the existence of jurisdiction. Furthermore, Thomas could have defended this mischaracterization of agency in the Montana trial. If Thomas was not the agent of Faulkner, he could have presented evidence to that effect at the Montana trial. Since this characterization as agent only goes to the amount of the judgment and not to the existence of jurisdiction, it is not extrinsic fraud and, thus, is no defense to the registration of the foreign judgment.

The second fraud alleged by Thomas is that the contract attached to the complaint filed in the Montana court is not the same contract that Falcon presented at the evidentiary hearing in Illinois. Furthermore, Thomas contends neither the contract attached to the complaint nor the contract presented at the evidentiary hearing, both of which are between Falcon and Faulkner, is the contract that Thomas originally sent to Falcon. Thomas testified that the contract he sent to Falcon showed his name and address as the owner of the contract while the contracts attached to the complaint and presented at the evidentiary hearing show Falcon as the owner of the contract. At the hearing, Thomas presented another contract which was meant to be representative of the type of contract that he originally sent to Falcon. The contract that Thomas presented showed Thomas as the owner of the contract but did not contain information filled in by Falcon after receiving Faulkner's consent to the assignment. Thomas attempted to use this contract as demonstrative evidence of the type of contract that he claimed he originally sent to Falcon. But, he admitted this was not the contract he sent originally to Falcon, and he further admitted that he did not have a copy of the contract he sent to Falcon.

■■ Again, this is not the type of fraud that would prevent the Montana court from acquiring jurisdiction over Thomas. If the contract that was attached to the complaint was not the contract that was entered into between Thomas and Falcon, Thomas could have challenged the validity of the complaint at the Montana trial. Thomas could have defended on the basis that the complaint was invalid because it did not include the contract between himself and Falcon. Furthermore, even if this were an incorrect contract, it has no relevance to the determination of jurisdiction. Jurisdiction is based on the contacts Thomas had with Montana, not whether the correct contract was attached to the complaint. The correctness of the complaint is relevant to the issue of whether there is a cause of action against Thomas.

Thomas' allegations that the contract attached to the complaint was not the same contract Falcon presented at the evidentiary hearing is similarly irrelevant. The inquiry is whether there was a fraud committed on the *Montana court* which prevented it from acquiring jurisdiction or gave it colorable jurisdiction. Events that happened after this jurisdiction was acquired, namely, the alleged presentation of a different contract at the evidentiary hearing, did not prevent the Montana court from acquiring jurisdiction in the first instance. Any alleged fraud which transpired herein was within the realm of intrinsic fraud, fraud that occurred after the court acquired jurisdiction.

■■ In conclusion, since the Montana court had jurisdiction over Thomas and there was no fraud in the procurement of the judgment, there is no defense to the registration of the foreign judgment. The decision of the circuit court granting the petition for registration of foreign judgment is affirmed.

Affirmed.

SPITZ and GREEN, JJ., concur.