DON FALCON *et al.*, d/b/a The El Leo Partnership, Plaintiffs-Appellees, v. RON THOMAS *et al.*, Defendants-Appellants.

Fourth District   No. 4—93—0678

Argued January 19, 1994.—Opinion filed February 14, 1994.

John F. Adams (argued), of Quincy, for appellants.

Terrence J. Anastas (argued), of Keefe, Gorman & Brennan, of Quincy, for appellees.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Defendants Ron Thomas (Thomas) and his sons, Ronald L. Thomas (Ronald L.), Stephen L. Thomas, Michael D. Thomas, and John E. Thomas, appeal from a judgment entered against defendants and in favor of plaintiffs Don Falcon and Berta Falcon, d/b/a The El Leo Partnership, following a bench trial in the circuit court of Adams County. As amended, the plaintiffs' complaint sought to set aside a transfer of real estate from Thomas to his four sons as a fraudulent conveyance under the Illinois Uniform Fraudulent Transfer Act (Act) (Ill. Rev. Stat. 1991, ch. 59, par. 101 *et seq.*).

Defendants raise two issues concerning the sufficiency of the evidence, to wit: whether plaintiffs produced enough evidence to raise a *prima facie* case and whether, in light of all the evidence, the judgment was against the manifest weight of the evidence. We affirm.

At the inception of the trial, plaintiffs made an oral motion which the trial judge construed as an alternative motion for a judgment on the pleadings and for a finding that, based on the pleadings and taking judicial notice of the Adams County case No. 89—L—32 (involving the registration of a foreign judgment), plaintiffs had made

out a *prima facie* case. That case was appealed to this court. (*Falcon v. Faulkner* (1991), 209 Ill. App. 3d 1, 567 N.E.2d 686.) In *Falcon v. Faulkner*, filed February 21, 1991, this court affirmed a decision to grant plaintiffs' petition to register a Montana judgment entered in favor of plaintiffs and against Thomas in the amount of $131,010.80. *Falcon v. Faulkner*, 209 Ill. App. 3d at 4, 567 N.E.2d at 689.

The trial court denied the plaintiffs' motion for judgment on the pleadings, but after counsel's argument granted the motion for a finding that plaintiffs had made a *prima facie* case. Defendants complain that the motion made by plaintiffs at the inception of the trial was improper because it was a "hybrid" motion. In the cases cited by defendants, the motions were pretrial motions authorized by different statutes and therefore requiring different analysis. *Rowan v. Novotny* (1987), 157 Ill. App. 3d 691, 693-95, 510 N.E.2d 1111, 1112-13, involved a motion to dismiss commingling motions under sections 2—615 and 2—619 of the Illinois Code of Civil Procedure (Code) (Ill. Rev. Stat. 1985, ch. 110, pars. 2—615, 2—619). In *Wilde v. First Federal Savings & Loan Association* (1985), 134 Ill. App. 3d 722, 729, 480 N.E.2d 1236, 1240-41, the motion was assertedly based on sections 2—606, 2—615, and 2—619 of the Code. *Premier Electric Construction Co. v. La Salle National Bank* (1983), 115 Ill. App. 3d 638, 642, 450 N.E.2d 1360, 1363, also involved a motion to dismiss which did not designate whether it was based on section 2—615 or 2—619 of the Code. Even in such situations, reversal is not required in the absence of prejudice to the opposing party. *Rowan v. Novotny*, 157 Ill. App. 3d at 693, 510 N.E.2d at 1112; *Premier Electrical Construction Co. v. La Salle National Bank*, 115 Ill. App. 3d at 642, 450 N.E.2d at 1363.

■ In this case, plaintiffs' attorney moved for judgment on the pleadings (Ill. Rev. Stat. 1991, ch. 110, par. 2—615(e)) on the basis that a *prima facie* case was established by plaintiffs through the admissions on file and the facts established in the prior case involving the registration of the Montana judgment. The motion for judgment on the pleadings was denied by the trial court so no prejudice to defendants could have resulted. However, based on the argument of plaintiffs' counsel, the trial court, referring to the motion as a "hybrid," deemed that the plaintiffs were also moving for a finding by the trial court that a *prima facie* case had been made and the burden of going forward had shifted to defendants without the need of plaintiffs having to present any additional evidence. This was made clear by the trial court.

The defendants argue that they were prejudiced by this procedure because they did not get the opportunity to make a motion for directed verdict and, thereby, require the trial court to weigh the ev-

idence to assess whether a *prima facie* case had been established. By plaintiffs' motion, the trial court was asked to weigh the sufficiency of the evidence, and defendants objected to that. As a result, defendants' argument is without merit.

■ Defendants also contend that plaintiffs did not produce sufficient evidence to establish a *prima facie* case. The circumstances in this case represent the "flip side" of a denial of a motion for directed verdict at the close of plaintiffs' case in chief. If a defendant moves for a directed verdict at the close of plaintiffs' case, but proceeds to present evidence after the motion has been denied, then the issue is waived. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1110.) The contention in this case that plaintiffs did not produce sufficient evidence to establish a *prima facie* case is deemed waived because defendants did not stand on their objection, but proceeded to produce evidence.

The only remaining question on review is whether the findings of the trial court are against the manifest weight of the evidence. (*People ex rel. Hartigan v. Anderson* (1992), 232 Ill. App. 3d 273, 277, 597 N.E.2d 826, 829.) Because the trial court's order relies on language from section 6(a) of the Act (Ill. Rev. Stat. 1991, ch. 59, par. 106(a)), this court's analysis will focus on that subsection also. Only if this court agreed with defendants that a judgment based on section 6(a) was against the manifest weight of the evidence would it be necessary to analyze the facts further to ascertain whether judgment would have been properly entered under any of the subsections of section 5 or under section 6(b) of the Act (Ill. Rev. Stat. 1991, ch. 59, pars. 105, 106(b)), or whether to remand to the trial court for that purpose.

In defendants' answers to plaintiffs' original and amended complaints, defendants admitted the following allegations: (1) on January 13, 1988, plaintiffs filed a complaint in the Eleventh Judicial District Court, Flathead County, Montana, seeking damages arising from the breach of a horse-breeding contract between plaintiffs and Thomas, a copy of which contract was attached to the original complaint; (2) on January 21, 1988, Thomas was duly served with a copy of the Montana complaint and summons by the Adams County, Illinois, sheriff's department; (3) on September 5, 1988, the Montana action was pending; (4) on or about September 5, 1988, Thomas was the owner of real estate located in Pike County, Illinois, described in a quitclaim deed, a copy of which was also attached to the complaint; (5) on or about September 5, 1988, Thomas made and executed the quitclaim deed purporting to convey said real estate to his four sons, also named defendants in this case; (6) on January 19, 1989, the Mon-

tana court entered the $131,010.80 judgment, including court costs, attorney fees, and interest at a rate of 10% per annum; (7) the petition to register the Montana judgment was filed in the circuit court of Adams County on March 8, 1989; (8) on November 16, 1989, while the registration of judgment action was pending in the circuit court of Adams County, the quitclaim deed was recorded in the office of recorder in and for Pike County, Illinois; and (9) that said conveyance tended to and did impair the rights of plaintiffs in that Thomas did not have money or property other than the property purportedly conveyed to his sons out of which plaintiffs' judgment could be satisfied. This final allegation was admitted in the original answer, but denied in the answer to the amended complaint. The defendants dispute that the trial court could rely on an admission in a pleading which had been supplanted by an amended pleading. However, such an admission, although not a judicial admission, may be introduced into evidence and may be considered by the trier of fact. *Precision Extrusions, Inc. v. Stewart* (1962), 36 Ill. App. 2d 30, 50-51, 183 N.E.2d 547, 556-57.

The copy of the quitclaim deed attached to the complaint recited that the conveyance of the property to the sons in joint tenancy was made for and in consideration of $10 and other "goods" and valuable consideration. The deed was prepared by John F. Adams (defendants' attorney). Adams notarized Thomas' signature on the deed, and Adams, as representative of the seller, acknowledged on the face of the deed that the transaction was exempt under subparagraph (e) of section 4 of the Real Estate Transfer Tax Act. (Ill. Rev. Stat. 1987, ch. 120, par. 1004(e).) The copy of the deed, which defendants did not challenge as inaccurate, also sets out the legal description of multiple parcels of property which the testimony later explained encompassed 1,342 acres. In addition, the return of service of process in this case showed Thomas resided in Texas at the time of being served on April 12, 1991.

Thomas testified that, at the time of trial, he resided in Miami, Florida. He moved there in October 1992. Prior to that he lived in Dublin, Texas. He moved there in the fall of 1987 from Quincy, Illinois. At the time of the hearing, on March 23, 1993, Ronald L. was 29, Michael was 25, Stephen was 23, and John was 19. When he moved to Texas, Thomas was in the business of buying and selling horses. His sons had been in the business. He was also in the truck sales business. Ronald L. went with him to Texas and worked in the truck business. The other family members actively participated in transporting trucks. In 1988, when he lived in Texas, he had bank accounts in Illinois and had notes at the Boatmen's Bank in Quincy.

Admitted into evidence were promissory notes payable to Boatmen's Bank dated January 14, 1988 ($150,000); December 23, 1988 ($300,000); and December 22, 1989 ($300,000). His signature was on the January 14 and December 23, 1988, notes. The signatures on the other note were his, Ronald L.'s, Michael's, and Stephen's. These notes represented a line of credit for the truck business. As to the indebtedness at the bank, there was always an inventory of trucks which would be applied against the loan value.

The deed conveying the subject farm to his four sons was dated September 5, 1988. He picked it up at his attorney's office, took it to the family residence in Quincy, and gave it to his ex-wife Sarah and Stephen. He told them he was paying his debt and it was their opportunity to take over. The deed was not recorded for over a year.

With regard to the deed, the sons did not give him cash or any other consideration. A financial statement signed by Thomas and dated August 4, 1989, was given to Harold Schork and reflected certificates of deposit in Boatmen's Bank of $225,000. He had a like sum in that bank and one of its affiliates the year before. Also admitted into evidence was a signature card for Boatmen's Bank showing two CDs, one in the amount of $125,000, and another for $100,000. The CDs were not pledged as collateral on any notes. Both CDs matured on January 19, 1990, and were cashed. The $125,000 CD could have been paid on the note. The funds from the other CD were wired to Texas. He had no CDs at the time of trial. The last time he had a CD in his name was January 19, 1990.

At the time of the conveyance in September 1988, he lived in Texas, and he had other assets in addition to the CDs. He then owned 90 head of horses. The horses were located in Illinois. None were in Texas. The horses were in Illinois until about the end of 1990. Their average value was $2,500. He sold the horses to Allen Faulkner in Oklahoma, Shelton Ranches in Texas, and Don Duwrall in Florida. He maintained no books, receipts, or records, and he filed no tax returns for 1989 and 1990.

At the time of the agreement between himself and his sons with regard to the farmland and the truck business, he also owned six or eight trucks. They were trucks he paid for personally, but they had "open titles." They were not owned by the business. Thomas never owned a license to sell trucks in his own name. He had done business in that fashion for 40 years without a dealer's license. Referring to the trucks listed on the financial statement, some were in open titles and some would have been in his own name or titled in the horse-dealing business.

He also had a $60,000 investment in a ranch in Texas owned by

Gina Peck. The investment in the ranch in Texas was started in 1985. From 1985 to 1991, the investment added up to $150,000. At the time of trial, he still owned a vacant two-apartment building in Quincy worth $8,000 or $10,000.

In the August 4, 1989, financial statement, there was a line item designating $175,000 as the value of horses and equipment. The value of real estate listed on that form was $1,073,600, which referred to the property he transferred to his sons. On the form, he indicated that the land was titled in his name. On the financial statement, there was an indication that the 1,342 acres in Pike County cost $670,000. Thomas attempted to explain that at the time he signed the financial statement he owned the Adams County landfill and the landfill was figured into the property value. No reference to the landfill was made in the financial statement, and he later testified he sold the landfill to the city in 1983 or 1984 for cash. He knew that banks rely on borrowers to be truthful when providing financial information, and the figures were on the financial statement when he signed it. He said he never looked at it, but just signed it.

He denied that the real reason he transferred the land to his sons was to avoid paying his debts, saying he had no debts. He did not remember making the statement in his deposition that the transfer was made "to protect them against the debts that I had," after plaintiffs' counsel read from the deposition as follows:

"And I'm referring to page 48 of the deposition and the first part of 47. I asked you a question. It starts out, 'Well, that was an agreement ***.' I'm sorry, we were talking beforehand about the deed and what was done with the deed and I asked you a question: 'Why would you have left it with Sarah?' And your answer: 'Well, that was an agreement that she was to get it transferred for the boys.' And I started a question: 'Where?' Your answer: 'To protect them against the debts that I had.'"

When asked if the deeding of the farm was a gift or a sale, Thomas stated it was a debt he paid. In 1987, when he filed a tax return, he did not show payment to his sons as expenses. Ronald L. was paid $100 per week when he was married. Michael was never paid anything. On an affidavit previously filed with the court, Thomas did not state anything about owing his sons money for past work, but only referred to their assuming the business debt. Thomas explained, "it didn't come to mind."

Michael Thomas and Ronald L. Thomas also testified. Both testified about the nature of their contributions to their father's business and their current ownership interests. They also testified to the agreement concerning the land being deeded over in consideration

for what the sons had done in the past and subsequently taking over the truck sale business and assuming the debt. Although the sons agreed to assume the debt and run the business, the line of credit did not reflect how much was owed, but how much was available. Ronald L. and Michael were unable to testify to the amount of the debt at the Boatmen's Bank which they agreed to assume. Neither knew the value of the farm, and neither knew the total amount their father owed them in late 1987 for the work that they had done.

Harold Schork, the president of Boatmen's Bank in Quincy since 1961, testified he had done business with Thomas for over 20 years. He loaned money to Thomas for a number of enterprises, including the horse-buying and -selling business and the wholesale truck business. The notes evidenced a line of credit. The $300,000 note dated December 22, 1989, signed by the sons would have been a renewal of the line of credit. There was at the time of trial an open line of credit, the payments of which came from the truck sales in Texas. Payments had always been current.

Schork knew of no other notes signed by defendants at the bank. Referring to the financial statement, Schork testified that the form would have been completed on or near the date shown on it, August 4, 1989. The writing on the form was Schork's. The figures would either have been provided by Thomas or taken off an old form, and the figures in the old form would at some point have come directly from Thomas.

To demonstrate the close relationship of the transactions in this case, we rely on the following chronology of events:

| | |
|---|---|
| APRIL 1986 | DATE OF ORIGINAL CONTRACT BETWEEN THE PARTIES |
| JANUARY 13, 1988 | PLAINTIFFS FILED MONTANA COMPLAINT |
| JANUARY 21, 1988 | THOMAS SERVED WITH MONTANA SUMMONS |
| MARCH 1988 | THOMAS & SONS ENTER INTO TRANSFER AGREEMENT |
| SEPTEMBER 5, 1988 | DATE OF QUITCLAIM DEED |
| JANUARY 19, 1989 | MONTANA JUDGMENT ENTERED |
| MARCH 8, 1989 | PETITION TO REGISTER MONTANA JUDGMENT IN ILLINOIS FILED |
| JUNE 6, 1989 | THOMAS SERVED WITH SUMMONS IN ILLINOIS REGISTRATION ACTION |
| AUGUST 4, 1989 | DATE OF FINANCIAL STATEMENT PRESENTED TO BOATMEN'S BANK |
| NOVEMBER 16, 1989 | QUITCLAIM DEED RECORDED |
| JANUARY 19, 1990 | TWO CDs WORTH $225,000 WERE CASHED |

| APRIL 17, 1990 | MONTANA JUDGMENT REGISTERED IN ILLINOIS |
| BY THE END OF 1990 | HORSES, VALUED AT $225,000, PREVIOUSLY KEPT IN ILLINOIS WERE SOLD |
| FEBRUARY 21, 1991 | ILLINOIS APPELLATE COURT AFFIRMED REGISTRATION OF MONTANA JUDGMENT IN ILLINOIS. |

The trial judge found that plaintiffs had raised a strong presumption of fraud in law, which defendants' evidence did not rebut. The court found the transfer fraudulent under section 6 of the Act, referring to language in subsection (a). (Ill. Rev. Stat. 1991, ch. 59, par. 106(a).) The trial court also found as follows: (1) the declaration on the deed that the transaction was exempt from the real estate transfer tax was evidence of lack of consideration; (2) there was no dispute that plaintiffs were preexisting creditors since plaintiffs' contract with Thomas dated back to April 1986, and plaintiffs' suit was filed prior to the date of the quitclaim deed; (3) defendants were unable to show that the purported conveyance was for adequate consideration; and (4) the evidence was sufficient to prove Thomas' insolvency, and defendants' evidence failed to demonstrate that plaintiffs' rights were not impaired at the time of the conveyance. The conveyance of the Pike County real estate from Thomas to his sons was set aside, and the defendants were enjoined from further disposing of the property.

Section 6(a) of the Act states:

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." (Ill. Rev. Stat. 1991, ch. 59, par. 106(a).)

A creditor, meaning a person with a claim (Ill. Rev. Stat. 1991, ch. 59, par. 102(d)), may bring an action under the Act seeking (1) to avoid the transfer, (2) for an attachment, (3) for an injunction against further disposition of the property, (4) for the appointment of a receiver, or (5) for any other equitable relief. (Ill. Rev. Stat. 1991, ch. 59, par. 108(a).) The creditor may also levy to seek execution on the transferred asset or proceeds therefrom if the creditor has a judgment on a claim against the debtor (the person liable on the claim). (Ill. Rev. Stat. 1991, ch. 59, pars. 108(b), 102(f).) Therefore, it is clear that a claim may exist even though a debt (defined as a liability on a claim (Ill. Rev. Stat. 1991, ch. 59, par. 102(e))) has not been reduced to

judgment. Indeed, a claim is a right to payment. The claim may or may not be reduced to judgment. It may be liquidated or unliquidated. It may be fixed or contingent. It may be matured or unmatured. It may be disputed or undisputed. It may be legal or equitable. It may be secured or unsecured. Ill. Rev. Stat. 1991, ch. 59, par. 102(c).

■ ■ Under section 6(a), the elements of the cause of action are (1) the creditor's claim arose before the transfer, (2) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transferred property, and (3) the debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer. Proof of actual fraudulent intent is not necessary. It was alleged in the complaint and admitted in the answer that on June 13, 1988, plaintiffs filed a complaint in the Montana court seeking to recover on their claim against Thomas. It was further admitted by defendant that while the action was pending, a quitclaim deed transferring the Pike County land and dated September 5, 1988, was delivered by Thomas to his sons. Based on these facts, the trial court could find that the claim arose before the transfer. This conclusion is also supported by the statute, which states that a deed is void as against creditors until it is filed of record. Ill. Rev. Stat. 1991, ch. 30, par. 29.

Defendants argue there was sufficient evidence of (1) adequate consideration and (2) the solvency of Thomas. In this case, the trial judge was in a better position than is this court to assess credibility of the witnesses, as the trial judge was able to observe them as they testified.

"In a bench trial, it is the function of the trial judge to weigh the evidence and make findings of fact. (*Chicago Investment Corp. v. Dolins* (1985), 107 Ill. 2d 120, 124.) In cases where *** findings of fact must be determined from the credibility of the witnesses, a court of review will defer to the trial court's factual findings unless they are against the manifest weight of the evidence. (*Dolins*, 107 Ill. 2d at 123-24; *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 318-19.) The court on review must not substitute its judgment for that of the trier of fact. *Cosmopolitan National Bank*, 103 Ill. 2d at 314-15." *Kalata v. Anheuser-Busch Cos.* (1991), 144 Ill. 2d 425, 433-34, 581 N.E.2d 656, 660-61.

■ The farm encompassed about 1,342 acres according to the description on the financial statement filed with the bank. Also according to Thomas' financial statement, the cost of the farm was $670,000, and on August 4, 1989, it had a value of $1,073,600. Thomas signed that document under a statement whereby he warranted and certified that the information provided therein was true, correct, and complete.

As already described, the deed indicated the conveyance was made for $10 and other "goods" and valuable consideration. In *Reagan v. Baird* (1985), 140 Ill. App. 3d 58, 66, 487 N.E.2d 1028, 1034, the recitation of "other valuable consideration" was deemed a mere conclusion which may be disregarded in determining whether the complaint stated a cause of action. Another fact which may be considered was that, on the deed, the conveyance was also stated to be exempt from the real estate transfer tax because the actual consideration for the deed was less than $100. (Ill. Rev. Stat. 1987, ch. 120, par. 1004(e); see *Effingham State Bank v. Blades* (1985), 139 Ill. App. 3d 259, 263, 487 N.E.2d 431, 435.) Based on these facts, the trial court could find that Thomas made a transfer of a considerable amount of land for less than $100, which would not be a reasonably equivalent value.

The defendants attempted to present evidence of prior services of Thomas' sons as consideration for the conveyance, as well as the promise by the sons to take over the truck sale business and assume the business debt. This was a matter of the credibility of the defendants, and apparently the trial judge did not accept their version of the reason for the transfer. There was also no evidence of any actual debt to be assumed at the time the deed was executed. Indeed, the transfer of the business to the sons could be viewed as another attempt to transfer property to avoid payment of Thomas' debt to plaintiffs. Where the challenged transaction involves an immediate family member as a preferred creditor, defendant has the burden of showing by "clear and satisfactory proof" a valid and subsisting debt which would be enforced and payment for which would be exacted regardless of the debtor's fortune or misfortune. (*Cairo Lumber Co. v. Ladenberger* (1941), 313 Ill. App. 1, 7-8, 39 N.E.2d 596, 599.) Defendants have not met this burden.

Insolvency is defined in section 3 of the Act, which states as follows, in relevant part:

"(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

* * *

(d) Assets under this Section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this Act.

(e) Debts under this Section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset." (Ill. Rev. Stat. 1991, ch. 59, pars. 103(a), (d), (e).)

At oral argument, defendants conceded that the factors enumerated in section 5(b) of the Act (Ill. Rev. Stat. 1991, ch. 59, par. 105(b)) could be utilized to establish insolvency even though the trial court granted relief under section 6(a). Section 5(b), though not all-inclusive, sets forth 11 factors which may be considered in determining the debtor's actual intent. The badges of fraud referred to in that subsection include transfer to an insider, the transfer was concealed, suit had been brought or threatened before the transfer was made, the debtor absconded, the debtor removed or concealed assets, the debtor was insolvent or became insolvent shortly after the transfer, and the transfer was for inadequate consideration. (Ill. Rev. Stat. 1991, ch. 59, pars. 105(b)(1), (b)(3), (b)(4), (b)(6), (b)(7), (b)(8), (b)(9).) Even prior to the Act, badges of fraud included inadequate consideration for the transfer, secrecy, haste, transfer after a suit has begun and while it was proceeding, transfer between family members, and a reduction of substantially all assets to cash. Such badges of fraud are indicia from which an inference of fraud may be drawn. 19A Ill. L. & Prac. *Fraudulent Conveyances* § 4 (1991).

The plaintiffs do not attack as fraudulent the liquidation of the CDs and the sale of the horses. Even though these transfers occurred after the deed was executed and the CDs were not pledged to the bank to secure any debt, the trial court could find that Thomas was insolvent at the time of the transfer of the land or became insolvent as a result of that transfer because the cashing in of all his assets and leaving the State was a part of the totality of the circumstances which demonstrated sufficient insolvency to render the purported conveyance of the land fraudulent. In this case, there is the additional fact that Thomas claimed the ownership of the subject real estate on the August 4, 1989, financial statement even though he had purportedly transferred it to his sons about one year prior thereto. In addition, the fact Thomas had not filed any income tax returns may be considered by the trial court as demonstrating a lack of income on the part of Thomas sufficient to pay his debts.

When the debtor has removed himself from the State, courts have considered that equivalent to insolvency. (*Kaibab Industries, Inc. v. Family Ready Homes, Inc.* (1978), 80 Ill. App. 3d 782, 786, 372 N.E.2d 139, 142-43; *Till v. Till* (1967), 87 Ill. App. 2d 358, 361, 231 N.E.2d 641, 643.) Actual insolvency is not required. The test is whether the conveyance directly tended to or did impair the rights of creditors. (*Cairo Lumber v. Ladenberger*, 313 Ill. App. at 6, 39 N.E.2d at 598-99.)

> "It is of no moment that the property remaining in the grantor's hands after the conveyance was in nominal value more than equal

to the amount of his indebtedness if subsequent events show that the property retained was not sufficient to discharge all his liability. [Citations.] The doctrine is firmly declared to be that one must be just before he is generous." *Birney v. Solomon* (1932), 348 Ill. 410, 414-15, 181 N.E. 318, 320.

In *Kardynalski v. Fisher* (1985), 135 Ill. App. 3d 643, 645-46, 482 N.E.2d 117, 118-19, two transactions occurred during the pending litigation by the creditor: (1) the debtor sold his house and gave his son the proceeds without receiving consideration; and (2) the debtor and the debtor's spouse divorced and fraudulently negotiated a property settlement which stripped the debtor of assets. Unlike the case at bar, however, both transactions were sought to be set aside. Here, the evidence is that Thomas left the State in 1987. He still had property in Illinois then. Later, he transferred the farm, cashed in his CDs, and sold his horses. Although some of these events occurred after the challenged conveyance of the real estate to his sons, the evidence establishes a series of transactions which rendered Thomas insolvent, and therefore, the insolvency element of section 6(a) is satisfied even though the evidence would not establish that the insolvency directly resulted only from the challenged transaction. The decision of the trial court is not against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Adams County is affirmed.

Affirmed.

KNECHT and LUND, JJ., concur.