In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-1862

CREDITOR'S COMMITTEE OF
JUMER'S CASTLE LODGE, INC.,

*Plaintiff-Appellant,*

*v.*

D. JAMES JUMER,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 05-1178—**Joe Billy McDade**, *Judge.*

ARGUED NOVEMBER 3, 2006—DECIDED JANUARY 2, 2007

Before EASTERBROOK, *Chief Judge*, and FLAUM and
WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge*. On October 13, 1999, Jumer's
Castle Lodge (JCL) filed for bankruptcy. As part of the
bankruptcy proceedings, JCL's Creditors' Committee (the
Committee) sued James Jumer to set aside a July 31, 1998
transaction that the Committee claimed was fraudulent.
The bankruptcy court granted summary judgment in
Jumer's favor, and the district court affirmed. For the
following reasons, we affirm as well.

**I.  Background**

In October 1997, Jumer was the principal shareholder of JCL, a financially unstable corporation that owned a central Illinois hotel chain recognizable for its historical German theme. Jumer knew that his company was struggling, so he attempted to sell it to Saranow Gaming Investors, Inc. (Saranow), through its representative, Frank Pedulla. Saranow declined to purchase JCL outright, however, because of JCL's shaky bottom line. JCL had already defaulted on loans with two different banks; its balance sheet revealed a number of past-due accounts receivable from other Jumer-owned entities; and it was paying Jumer $14,000 per month to lease property for its Galesburg Hotel.

Preferring a less risky investment, Saranow agreed to purchase thirty percent of JCL's stock for $2 million, with the condition that JCL and Jumer make a number of transfers aimed at improving JCL's balance sheet. Jumer had to transfer to JCL his ownership in the Galesberg Hotel property (to eliminate the monthly lease payments), two parcels of real property adjacent to JCL's Peoria Hotel, and $1 million in cash in partial satisfaction of numerous promissory notes and accounts receivable due and owing from Jumer's other enterprises. In exchange, Jumer had to accept all of JCL's non-hotel assets, including its inter-company accounts receivable, three automobiles, the existing cash value of Jumer's life insurance policy, and a gas station.

On July 31, 1998, Saranow, JCL, and Jumer entered into two interrelated agreements: an Agreement for Sale of Real Property (covering the transactions between Jumer and JCL) and a Securities Purchase Agreement (covering Saranow's purchase of thirty percent of JCL's stock). The agreements resulted in the following transfers:

- Jumer gave JCL the Galesberg Hotel valued at $2.1 million,[1] the property adjacent to the Peoria Hotel valued at $100,000, and $1 million in cash.

- Saranow gave JCL $2 million.

- JCL or Jumer (it is not clear which) gave Saranow thirty percent of JCL's stock.[2]

- JCL gave Jumer an account receivable, the book value of which was $2,767,545; additional accounts receivable valued at $1,459,110; three automobiles valued at $64,000; a number of life insurance policies valued at $100,504; and a gas station valued at $106,493.

Unfortunately for JCL, the influx of capital was not enough to keep it solvent, and on October 13, 1999, it filed for bankruptcy. The Committee then filed suit against Jumer, seeking to set aside the Agreement for Sale of Real Property under the Illinois Uniform Fraudulent Transfer Act (IUFTA), 740 ILCS 160/6. The Committee alleged that JCL did not receive reasonable equivalent value for the items it transferred to Jumer.

---

[1] The parties offered conflicting evidence concerning the value of the Galesberg Hotel. Because we are reviewing a summary judgment ruling, we assume that the Committee's appraisal was accurate.

[2] The parties dispute who owned the stock that Saranow purchased. Jumer contends that he owned it, and the Committee contends that JCL owned it. Inexplicably, the Securities Purchase Agreement is not in the record, and the parties have not cited any evidence that sheds light on the issue. Frank Pedulla stated in his affidavit that he "proposed Saranow's purchase of a 30% interest *from JCL* for the sum of $2,000,000." Pedulla Aff. ¶8 (emphasis added). Pedulla's testimony, however, only discusses an initial proposal and does not discuss what happened when the parties actually consummated the deal.

On June 3, 2004, Jumer filed a motion for summary judgment, arguing that JCL received far more than it surrendered in the two July 31, 1998 transactions. He maintained that the $2,767,545 account receivable that JCL transferred to Jumer was essentially worthless. In support of this argument, Jumer offered the affidavit of John Elias, JCL's attorney during the July 31 transactions, who averred that the account represented a loan to Jumer's of St. Charles (JSC), another Jumer-owned company, and that JSC used the loan proceeds to purchase a steel hull for a riverboat casino. Elias said that the State of Missouri ultimately refused to license the partially constructed casino and that, as a result, JSC had to sell the hull for scrap. He also stated that at the time of the July 31 transactions, JSC had no prospect of obtaining a casino license, virtually no assets, and no ongoing operations. Jumer's motion for summary judgment also argued that the bankruptcy court should examine both July 31 transactions together when evaluating whether JCL received adequate consideration. That approach, Jumer asserted, would appropriately take into account the $2 million investment that JCL received from Saranow.

The bankruptcy court granted Jumer's motion. It evaluated the July 31 transactions together for purposes of determining whether there was a fraudulent transfer. It also concluded that the Committee offered no evidence that the JSC account receivable was worth more than $17,000, but stated that the transaction was fair regardless. Based on these conclusions, the bankruptcy court held that the Committee had not offered evidence from which a jury reasonably could find that JCL made a fraudulent transfer. On appeal, the district court affirmed, adopting the bankruptcy court's analysis.

## II. Analysis

The Court reviews de novo the bankruptcy court's entry of summary judgment. *See Lee v. Keith*, 463 F.3d 763, 767 (7th Cir. 2006). Under Federal Rule of Civil Procedure 56(c), a party moving for summary judgment has the initial burden of "informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, summary judgment is proper if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In other words, to survive Jumer's summary judgment motion, the Committee had to offer evidence from which a jury reasonably could find in its favor. *See Yindee v. CCH, Inc.*, 458 F.3d 599, 601 (7th Cir. 2006).

Under the IUFTA,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6. Illinois courts have not elaborated on the meaning of "reasonably equivalent value," except to note that a transfer lacks reasonably equivalent value if there is no or inadequate consideration. *Regan v. Ivanelli*, 246 Ill. App. 3d 798, 804, 617 N.E.2d 808, 814 (1993). This Court has recognized, however, that because the IUFTA

is a uniform act, we may look to cases decided under 11 U.S.C. § 548, as well as cases interpreting other states' versions of the Uniform Fraudulent Transfer Act (UFTA), to determine the meaning of the phrase. *See In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998). In one § 548 case, we said that "[t]he test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the [C]ourt to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997). The parties agree that this definition of reasonably equivalent value provides the correct method for evaluating whether a transfer is fraudulent under Illinois law. *See* Appellant's Br. at 16; Appellee's Br. at 5-6.

The parties do not agree, however, that JCL received as much as it gave up in the two transactions. The Committee repeats its contentions—rejected by the district and bankruptcy courts—that the reasonably equivalent value calculation should not include the $2 million that Saranow paid JCL and that the JSC account receivable was worth its book value. It also argues, alternatively, that even if the bankruptcy court correctly included the $2 million investment as an asset that JCL received in the July 31 transactions, it ignored the fact that JCL also transferred thirty percent of its stock to Saranow during the same transaction. Jumer responds that the bankruptcy court correctly included the $2 million in the calculation because it was part of the same overall transaction, that Jumer—not JCL—owned the stock that Saranow received, and that the Committee has offered no evidence that the JSC account receivable was worth more than $17,000.

At the outset, we note that the parties' dispute over who initially owned the stock that Saranow received was not relevant to the bankruptcy court's reasonably equiva-

lent value calculation. Even if, as the Committee contends, JCL owned the stock that it transferred to Saranow, JCL did not surrender any assets by doing so. Unissued stock is not an asset of a corporation. *See Engel v. Teleprompter Corp.*, 703 F.2d 127, 131 (5th Cir. 1983); *U.S. Cellular Inv. Co. of L.A., Inc. v. AirTouch Cellular*, No. CV 99-12606 DT BQRX, 2000 WL 349002, \*7 (C.D. Cal. March 27, 2000) (collecting cases). As a result, JCL's stock issuance (if it occurred at all) had no bearing on the bankruptcy court's calculation.

We next consider whether the bankruptcy court correctly included the $2 million Saranow investment in its calculation. Both lower courts correctly explained that JCL received over $5 million and gave up around $4.4 million if the $2 million investment is included in the calculation. This is true even assuming—as the district and bankruptcy courts did—that the JSC account receivable, which JCL transferred to Jumer, was worth its full book value, $2,676,595.

An important question, therefore, is whether Illinois courts evaluate reasonably equivalent value by collapsing related transactions and analyzing them together. The district court concluded that Illinois courts would collapse related transactions, but did not cite an Illinois case for the proposition. Instead, it relied on federal court decisions applying other states' versions of the UFTA. *See In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 356 (C.D. Ill. 2006) (citing *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (applying New York law) and *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212 (3d Cir. 1990) (applying Pennsylvania law)). Though the district court's analysis is compelling, we decline to resolve whether the district court—and the decisions it cited—correctly predict the Illinois Supreme Court's eventual resolution of this matter, for there is an alternative reason to affirm the bankruptcy court's ruling.

As discussed above, Jumer, in his motion for summary judgment, maintained that the JSC account receivable was not worth its full book value because there was little to no likelihood that JSC would ever repay the debt. In support of this argument, Jumer offered evidence that the actual value of the JSC debt was next to nothing because JSC used JCL's $2 million loan to buy a steel hull for a riverboat casino that never obtained a license. Jumer also offered evidence that at the time of the July 31, 1998 transactions, "[t]he total assets of [JSC], including the proceeds of the eventual sale of the gambling boat hull . . . totaled approximately $16,000-$17,000" and that JSC "had no future prospects of obtaining a gaming license, and had no ongoing operations." Elias Aff. ¶8.

In response, the Committee offered the account's book value but offered no evidence concerning the likelihood that the account would ever be repaid. This evidence is insufficient to create a genuine issue of material fact. Simply put, no jury reasonably could find that the JSC account was worth its full book value, knowing that JSC had virtually no assets or ongoing operations. For this reason, the bankruptcy court correctly granted summary judgment in Jumer's favor.

As a last ditch argument, the Committee contends that the lower courts erred by ruling that it had the burden of proving that JCL made a fraudulent transfer. In support of this argument, the Committee cites *Falcon v. Thomas*, 258 Ill. App. 3d 900, 629 N.E.2d 789 (1994), *Hartigan v. Anderson*, 232 Ill. App. 3d 273, 597 N.E.2d 826 (1992), and *Kardynalski v. Fisher,* 135 Ill. App. 3d 643, 482 N.E.2d 117 (1985). These cases, however, are not controlling. They hold that when a debtor makes a transfer to a family member, receives inadequate consideration in return, and then becomes insolvent, the defendant has the burden of rebutting a presumption of fraud by clear and convincing proof. In this case, the Committee has

offered no evidence that the transactions in question involved inadequate consideration or family members. As a result, the Committee correctly shouldered the burden of proof.

The Committee also contends that Jumer should bear the burden of proving the fairness of the transaction, because in a breach of fiduciary duty case, the fiduciary bears the burden of proving the fairness of an insider transaction. *See Ciolek v. Jaskiewicz*, 38 Ill. App. 3d 822, 829, 349 N.E.2d 914, 920 (1976). The Court rejects this argument as well. First, the Committee did not allege a breach of fiduciary duty claim in its complaint. Second, the Committee has not cited—and we have not found— any case brought under the IUFTA in which a court has shifted the burden of proof to an interested shareholder or director to prove that a transfer was not fraudulent. To the contrary, the plaintiff ordinarily bears the burden of proving a fraudulent transfer. *See, e.g.*, *Casey Nat'l Bank v. Roan*, 282 Ill. App. 3d 55, 59, 668 N.E.2d 608, 611 (1996).

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's ruling.

A true Copy:

   Teste:

       _____
       *Clerk of the United States Court of*
       *Appeals for the Seventh Circuit*